# In the United States Court of Federal Claims

No. 07-165 C
(Filed March 29, 2013)

| | |
|---|---|
| HERNANDEZ, KROONE AND ASSOCIATES, INC., | ) |
| Plaintiff, | ) Equitable Adjustment; Contract Disputes ) Act; Fraud Counterclaims; Special Plea in ) Fraud, 28 U.S.C. § 2514; False Claims Act, |
| v. | ) 31 U.S.C. § 3729; CDA fraud provision, 42 ) U.S.C. § 7103(c)(2). |
| THE UNITED STATES, | ) |
| Defendant. | ) |

## OPINION

*Laurence P. Lubka*, Pasadena, CA, for plaintiff. *Richard Mah*, of counsel.

*Daniel Rabinowitz,* Department of Justice, Washington, D.C., with whom were Assistant Attorney General *Tony West*, *Jeanne E. Davidson*, Director, and *Donald E. Kinner*, Assistant Director, for defendant.

**Merow**, *Senior Judge*.

This litigation stems from a 2005 contract between the United States Army Corps of Engineers (COE) and Hernandez, Kroone & Associates, Inc. (HKA) for a modular building, to be factory-constructed, delivered and installed, for use as a Border Patrol Station by the United States Department of Homeland Security (DHS), on a site in Indio, California. The contract required site preparation and construction of an adjoining paved parking lot and perimeter security fencing.

Plaintiff, HKA, contends that it was required to perform work beyond the scope of the contract, for which it seeks compensation, whereas defendant contends that all work ordered was within the scope of the contract and further counters with a demand that plaintiff's claims be forfeited pursuant to 28 U.S.C. § 2514 and that monetary damages or penalties be assessed against plaintiff pursuant to 41 U.S.C. § 7103 (Contract Disputes Act) and 31 U.S.C. § 3729 (False Claims Act).

## FACTS

At some point in late 2004, DHS contacted the Fort Worth, Texas District COE concerning initiating a procurement for a modular building to serve as a United States Border Patrol (USBP) Station in Indio, California.  Alain Bernier of the Fort Worth District had prior modular building contract experience with General Modular Corporation (GMC) of Fort Worth, Texas and contacted its president and chief executive officer, John Bennett for assistance in preparing the scope of work and specifications for the project the COE needed to initiate a contract action. (Transcript (Tr.) 2006, 2076.)  The COE forwarded to Mr. Bennett a basic program requirement for a 48-foot by 60-foot (48' x 60') modular facility of four single-wide, 12-foot by 60-foot (12' x 60') units. (Tr. 2091; Joint Exhibit (JX) 342.)  The COE's program for the building's roof provided "(1) Requesting low pitched roof.… (2) Covering: Shall be covered with 30 year, architectural shingles." (JX 342.004.)

Mr. Bennett discussed the basic COE program he was furnished with Ken Vian, the DHS Border Patrol representative assigned to the project, pointing out conflicts he had identified in the program and items that it would not "be smart to be executed." (Tr. 2091.)  One such item was the requested pitched roof with architectural shingles. Mr. Bennett proposed instead a basically flat "EPDM"[1] roof. (Tr. 2091-93.)  As the building had to be delivered by highway from a factory to the Indio site, and was designed so it could be dismantled and relocated thereafter, a pitched roof would be too tall for shipment and would restrict mobility. (Tr. 2045.)

On December 8, 2004, GMC submitted a proposal for the Indio Border Patrol project to Alain Bernier at the Fort Worth COE District. (JX 315.005, 338.) Included were General Construction Specifications, Scope of Work, Building Floor Plan and Site Plan. (*Id.*)  The total project cost was $942,273.00 which included a $25,000.00 "allowance" for security cameras and monitoring system and $39,044.50 for a complete civil engineering package from HKA. (JX 315.005.)  The HKA civil engineering package included $6,671.50 for "Security Camera & Lighting Plan." (JX 208, 315.013.)  GMC sought a proposal from HKA for the civil engineering work because HKA had previously performed a boundary survey of the Indio site in connection with its acquisition by the government. (Tr. 59-61, 2007.)  GMC's

---

[1]  EPDM, Ethylene Propylene Diene Monomer, is a synthetic rubber. *See* http://www.rtnroofing.com/articles/511.htm.

proposal also provided that the modular building construction would be subcontracted to Walden Structures in Riverside, California. (JX 315.009.) The attached Walden quotation included a roof system described as "Black EPDM over ½" gyp sheathing." (JX 315.010.) The Walden quotation to GMC was based on the original guidance Mr. Bennett received from the COE as edited by Mr. Bennett based upon his experience and discussions with Mr. Vian. (Tr. 2083.)

The $942,273.00 GMC proposal included $45,505.00 for a "City of Indio water impact fee" and $10,000.00 for an estimated waste water impact fee. (JX 338.002.) On January 10, 2005, Mr. Bennett (GMC) sent a letter to Alain Bernier (COE) reporting conversations with Ken Vian (DHS) to the effect that the government was not required to pay sewer and water impact fees, so $55,505.00 was removed from GMC's proposal. (JX 339.) The cost of a conduit to run between the Indio project and a Border Patrol facility nearby was added and the proposal was revised to $875,768.00. (*Id*.)

Instead of proceeding further with GMC's proposal, the COE informed Mr. Bennett that it had been decided that the contract for the Indio Border Patrol project would be awarded to an 8(a) contractor. (Tr. 2011.) Since February 1, 2002, the Small Business Administration (SBA) and the Department of Defense (DOD) partnered to identify civil construction requirements for 8(a) sole source contracting and the Indio project was selected for such an award.[2] (JX 144.)

Mr. Bennett informed the COE that in the process of developing GMC's proposal he learned that HKA was in the SBA 8(a) program; accordingly, Mr. Bennett proposed that HKA become the prime contractor for the Indio project and that GMC would endeavor to serve as a subcontractor to HKA for the modular building and site fencing portions. (Tr. 2012-14.) In other words, GMC and HKA would somewhat switch positions for this procurement. At this time, HKA was a small civil engineering/construction management business jointly owned by a couple, Richard and Anne Hernandez, both holding engineering degrees. (Tr. 46-51, 619.) While HKA had performed several federal engineering contracts, their major customer was the California Department of Transportation (Caltrans). (Tr. 46-52.)

---

[2] The 8(a) program assists small businesses, owned and controlled by socially and economically disadvantaged individuals, in obtaining federal contracts. *See* 15 U.S.C. § 637(a).

Mr. Bennett contacted Mr. Hernandez, informed him of the COE's intent to award a sole source 8(a) contract and suggested that HKA submit an unsolicited proposal to COE. (Tr. 63.) Mr. Bennett sent Mr. Hernandez copies of all the material forming the basis for GMC's $875,768.00 proposal to COE for the Indio project. (JX 305, 315, 342.)  GMC also submitted a subcontract proposal to HKA to design, construct, deliver and install a modular building and site fencing for the Indio project for $371,250.00. (Tr. 2012-15; Defendant's Exhibit (DX) 49.)  Attached to the GMC proposal was the Walden Structures' specifications for the modular building, including a roof comprised of "Black EPDM over ½" gyp sheathing." (*Id.*)  Also attached to GMC's proposal was a fencing quote from Alcorn Fence Company which provided for 10' high chain link topped with barbed wire, the fence wire to be "non-climb." (*Id.*)

Upon receipt of the bid material from Mr. Bennett, Mr. Hernandez called his construction manager, Roland Hill, stating that HKA now needed to prepare a proposal for the whole Indio project and they commenced to verify the pricing information that Mr. Bennett had provided. (Tr. 80.) HKA's estimate for its proposal to be submitted to COE used the $371,250.00 GMC bid for the modular building and site fencing.  (JX 347.)  The remaining work on the project was estimated at $504,518.00, including site lighting at $22,500.00 and security cameras at $31,250.00. (*Id.*)

On January 25, 2005, Mr. Hernandez submitted HKA's $875,768.00 proposal for the Indio project to Alain Bernier at the Fort Worth District COE. (JX 324.) The cover letter to "Mr. Bemier" [sic] stated:

> Please find the attached General Construction Specifications, Scope of Work, Building Floor Plan and Site Plan.  The total project cost is has [sic] been revised to $875,768.00.  Below is a detailed list of items that are included in this proposal.
>
> Included in the Proposal Price
>
> 1. Complete civil engineering package.  See attached letter and          $39,044.50
>    scope of work.
>
> 2. Security Cameras and monitoring systems (allowance)          $25,000.00
>
> 3. Landscaping, including irrigation          $5,000.00

| | |
|---|---|
| 4.  Site built trellis on the rear of the building | $7,500.00 |
| 5.  Phone, date [sic] lines and terminations (allowance) | $5,500.00 |
| 6.  Storm water detention pond grading (allowance) | $5,000.00 |
| 7.  Installation of 60' long 2" service conduit between the two sites. | $5,000.00 |

Per our previous understanding, the Unicor work stations, City of Indio water impact and waste water impact fees, and bonding are excluded.

The floor plan of the building is based on the original proposal requirements prepared by General Modular Corporation.  This floor plan was modified to reflect the needs of the end user.  The modifications did not increase the cost or size of the building but just simply reallocated space based on the end users['] needs.

The site plan that was developed shows a storm water detention facility.  This may not be required.  The site plan also shows paving covering the entire site.  The proposal however only includes 80,000 sqft of base and 50,000 sqft of asphalt.  The 50,000 sqft is enough asphalt to cover the parking area but not the entire site.  The same is true for the additional 30,000 sqft of base.  The cost of the base is only $0.60 per sqft[;] it appears that an additional 20,000 sqft of base would be sufficient to cover the balance of the fenced area as well as extending from the edge of the asphalt to extend under the fence.

Per General Modular's meeting with the City of Indio, it is suggested that you exempt yourself from the permit process.  None of these fees unless stated in the above paragraph are included.

We have also included specific information on the fencing specification this specification should provide you the function that you require and not exceed the budget.

(JX 324.)

HKA's January 25, 2005 proposal enclosed the 3-page Walden Structures' specifications for the modular building showing the roof as "Black EPDM over ½" gyp sheathing," together with the original COE's basic program requirements previously provided to Mr. Bennett, which for the roof, stated, "(1) Requesting low pitched roof" and "Shall be covered with 30 year, architectural shingles."  (*Id*.)  The scope of the work portion of HKA's January 25th proposal to COE provided that site

fencing have "'anti-climb' fabric mesh that has no dimension greater than one inch." (*Id.*)  The scope of security lighting work would be determined from site plans, but at a minimum would include perimeter lighting, lighting at gates, and lighting in the parking area.  (*Id.*)  The scope of work for the site called for six 30-foot light poles with KIM lighting heads.  (*Id.*)  The security scope of work also included six ultra sensitive, low light level cameras "to provide more superior site security."  (*Id.*)

On January 28, 2005, COE commenced the process to initiate the award of a sole source 8(a) contract for the Indio Border Patrol Station to HKA.  (JX 152, 162.)  COE prepared a solicitation of over 200 pages for the construction contract involved.  (JX 381.)  On or about February 5, 2005, HKA downloaded the solicitation from the COE website.  (JX 359; Tr. 95-98.)  HKA's review of the solicitation led to a conclusion that it substantially differed from the project on which their January 25, 2005 proposal was based.  (Tr. 99-106, 623.)  In particular, the solicitation, in clause 52.222-6, required that laborers and mechanics employed or working on the construction site be paid at rates not less than those contained in an attached wage determination by the Secretary of Labor.  (JX 381.052.)  HKA had not addressed paying these Davis-Bacon Act, 40 U.S.C. § 3141 *et seq.*, wage rates in its January 25, 2005 proposal.  (Tr. 104-05.)  The solicitation required the submission of a bid guarantee and payment and performance bonds, items not addressed in HKA's January 25, 2005 proposal.  (JX 381.071 (bid guarantee), 381.076 (performance/payment); Tr. 632-33.)  The solicitation required the submittal of various plans, such as an environmental protection plan (JX 381.166), a quality control plan (JX 381.208), an accident prevention plan (JX 381.225), and an activity hazard analysis.  (*Id.*).  These requirements were not addressed in HKA's January 25, 2005 proposal.  (Tr. 623.)

The COE's solicitation also modified the scope of work for the parking lot adjoining the modular building as compared to the work scope on which HKA's January 25, 2005 proposal to COE was based.  The January 25, 2005 proposal contemplated "approx. 50,000 square feet plus" of asphalt whereas, the COE solicitation required "approx. 15,000 square feet."  (JX 324.017, 381.032.)  The January 25, 2005 proposal included "[a]pproximately 6 ultra sensitive, low light level cameras" and "6, 30' light poles … heads are to be KIM Lighting," whereas the COE solicitation scope of work did not mention cameras or light poles.  (JX 324.016-.019, 381.032-.034.)

For the modular building, the January 25, 2005 proposal included both the 3-page Walden Structures' specification, providing a flat "EPDM" roof and the original COE guide in "(1) Requesting low pitched roof" whereas the COE solicitation included only the original COE guide. (JX 324.006-.015, 381.035-.040.)

HKA commenced work to prepare a bid in response to the COE solicitation. (Tr. 107.) Previously contacted people were re-contacted to check their reactions to Davis-Bacon wage rates. (*Id*.) Mr. Bennett reported that GMC's subcontract price for the January 25, 2005 proposal was still valid to use for HKA's bid responding to COE's solicitation. (Tr. 111.) GMC had included a 25% profit in its proposal. (Tr. 2115.) On February 15, 2005, HKA forwarded to the COE Fort Worth District its offer (Form 1442) to "furnish all services, material, supplies, plant, labor, equipment, and superintendence to construct the USBP Station, Indio, CA, in accordance with the Scope of Work and Specification[s] attached to this solicitation and any resulting contract." (JX 363.) HKA's offer was a lump sum of $875,468.00 (JX 363.004.) After submitting its offer, HKA was contacted by COE concerning a need to add two items to the Scope of Work. (Tr. 115-16.) The items were testing subgrade compaction and asphalt and installation of a 60' x 2" service conduit between the existing USBP facility and the new site. (JX 218.004.) HKA agreed to the addition of these two items to the solicitation Scope of Work at no additional cost, the offer remaining at $875,468.00. (Tr. 118.) COE Fort Worth District on March 16, 2005, sent to HKA a revised Scope of Work for the Indio Project, dated March 11, 2005, adding the two items. (JX 218.)

On February 15, 2005, Alain Bernier, the COE project manager, submitted a Price Negotiation Memorandum to the Fort Worth COE Contracting Division covering negotiations for the proposed Indio project. (JX 362.) The memorandum purports to cover negotiations with HKA, but the negotiations cited were with Mr. Bennett of GMC. The stated "proposed" price of $938,000.00 was never submitted by HKA, but is close to the $942,273.00 proposal GMC submitted for the Indio project on December 8, 2004. (JX 338.) The "negotiated" price of $875,768.00 is the amount reached when GMC (Mr. Bennett) withdrew $55,505.00 from his proposal, for sewer and water impact fees, after conversations with Ken Vian (DHS) to the effect that the fees would not be assessed, and added the cost of a conduit between Border Patrol facilities. (JX 339.) The $875,768.00 price is also the sum in HKA's unsolicited January 25, 2005 proposal, which did not involve negotiations with COE. (JX 324; Tr. 93-94.) HKA's offer in response to the COE's subsequent

solicitation for a sole source 8(a) contract was $875,468.00, not the $875,768.00 stated in the price negotiation memorandum. (JX 362-63.) In any event, the recommendation in the Price Negotiation Memorandum that the contracting office proceed with a $875,768.00 award to HKA was approved by LaVette C. Buford, the contracting officer at the Fort Worth District COE, on March 11, 2005. (JX 362.002.)

By letter dated March 29, 2005, the contracting officer notified HKA that it had been awarded the contract for the USBP Station, Indio, California as follows:

> Your proposal dated 25 January 2005, in the amount of $875,768.00, Line Item 0001 and the Scope of Work, drawings and specifications (11 pages) including construction duration of 150 calendar days under Solicitation Number W9126G-05-R-0018, USBP Station, Indio, California is accepted. Contract Number W9126G-05-C-0010 and Defense Priorities and Allocations System letter are enclosed.

> Within 10 days after receipt of this award letter, please execute two copies of the performance and payment bonds (See Section 00500) and submit them to this office along with proof of the minimum insurance you are required to procure and maintain during the entire period of the contract as stated in Section 00800, Special Contract Requirements, Required Insurance. It is also required that you maintain during the entire period of the contract proof of the minimum required insurance of your subcontractors.

> You are encouraged to develop, prepare, and submit value engineering change proposals. (See Section 0700, Contract Clauses, Value Engineering-Construction)[.]

> This letter does not constitute a Notice to Proceed.

(JX 247.002.)

The cited proposal date and price relate to the HKA's unsolicited January 25, 2005 proposal (JX 324), whereas the cited 11-page Scope of Work and Specifications refers to the March 11, 2005 revised scope of work. (JX 218.) The Form 1442 contract, as executed on March 29, 2005, by LaVette C. Buford, contained the $875,768.00 lump sum price. (JX 373.006.) On April 7, 2005, HKA executed Performance and Payment Bonds covering the contract, for the penal sum of $875,768.00. (JX 248.)

Following the award of the Indio Project Contract to HKA, the COE commenced discussions as to which office would oversee the contract work. (JX 385,

822-23.)  On April 22, 2005, The Indio Border Patrol Station (BPS) Contract was transferred from the Fort Worth District COE to the Los Angeles District COE with contracting officer duties to be performed by Patricia Bonilla.  (JX 252, 378, 386.) Joseph Flynn was designated the Contracting Officer's Representative (COR) for administration of the contract.  (JX 255.)  Mr. Flynn served as COE Project Engineer for the contract working out of the March Air Force Base COE Office.  Mr. Flynn reported to Daniel W. Moore, Administrative Contracting Officer (ACO), as his supervisor.  (Tr. 1630; JX 823.)  Roger N. Berg served as COE Office Engineer and Alternate Chief Construction Representative on the Indio project.  (JX 393.008; Tr. 1405-06.)  Larry R. Romero served as COE Inspector.  (Tr. 1768-69.)

As an initial step in contract performance, Larry Romero scheduled a Pre-Construction Meeting (conference) for April 26, 2005, at the COE March Air Force Base office.  (JX 253, 387.)  Attending were: Richard Hernandez, Anne Hernandez and Roland Hill for HKA; John L. Bennett for GMC; Joseph Flynn and Larry Romero for COE; and Ken Vian, Michael Singh, and Ralph D. Boubel for the Border Patrol. (JX 395.)  The conference turned out to be somewhat disorganized.  John Bennett and the Border Patrol personnel at one corner of the conference table discussed modifications to modular building plans Mr. Bennett had brought.  (Tr. 145-46, 647.) Anne Hernandez and Larry Romero had discussions concerning a 39-page pre-construction conference summary he wanted her to sign but as it contained errors, such as an 1899 notice to proceed date, she refused.  (JX 393.04; Tr. 144, 648-49.) Richard Hernandez, Roland Hill and Joseph Flynn's discussions concerned HKA's role as an 8(a) contractor and future relations with COE during contract performance. (Tr. 146-47, 647.)  Joseph Flynn directed Larry Romero to send a CD of lengthy Performance Oriented Construction Activity Specifications (POCA) to HKA which he asserted were applicable to this project.  (Tr. 247.)  However, POCA specifications are applicable to only certain types of COE contracts, which did not include HKA's contract for the Indio Border Patrol Station, a point Flynn eventually conceded somewhat later in HKA's contract performance.  (JX 322.002, 595.006; Plaintiff's Exhibit (PX) 10022.002; Tr. 676, 1199-1200.)

On May 6, 2005, the COE issued HKA a Notice to Proceed with the contract work, which, given the contractual 150 calendar days performance time, established a contract completion date of October 3, 2005.  (JX 396.)  At a meeting held with COE and Border Patrol officials on May 18, 2005, HKA personnel were informed, among other items, that HKA was responsible for the payment of developer water and

sewer impact fees to local authorities and that 3/4" aggregate was required for the asphalt paving on the project. (JX 16, 274, 595.003; Tr. 651-52.) On May 19, 2005, Larry Romero (COE) sent to Ken Vian (Border Patrol), for approval of the changes and the proposed $14,261.71 cost, a Walden Structures' change order proposal listing twenty-nine modifications to the modular building plans. (JX 406.) On June 4, 2005, HKA signed a Subcontract Agreement with GMC to perform the work specifically set forth in the Agreement, the Scope of Work and "Exhibit A" attached to the Agreement, for the sum of $371,250.00. (JX 413.) According to the January 25, 2005 proposal submitted to HKA by GMC, the $371,250.00 comprised: $223,750.00 to design and construct the modular office building; $5,000.00 for the delivery of the building to the site; $20,000.00 for design and installation of the building and foundation; $112,500.00 for fence and gates; and $10,000.00 for travel and project management. (JX 413.010.) "Exhibit A" consisted of the Walden Structures' specification which provided for a "Black EPDM over ½" gyp sheathing" flat roof. (JX 413.013.) The original COE program specification for a low pitched shingled roof, included in the COE's February 5, 2005 solicitation, was not included in the HKA-GMC Subcontract Agreement. (JX 413.)

After a meeting was held on June 7, 2005, at the COE's March Air Force Base Office, where the specifics of the project were discussed, Anne Hernandez sent a proposed contract change order to Larry Romero and Joe Flynn. (JX 276, 282.) The proposal was suggested "to clean up discrepancies between HKA's cost proposal, the RFP solicitation, and the contract" for a total increase in the contract price of $21,756.71. (JX 276.) The $21,756.71 proposal included $14,261.71 for the twenty-nine modifications to the modular building plans identified as "Border Patrol's Request." (JX 276.002.) The amount of asphalt for paving needed was increased from 15,000 to 50,000 square feet at no proposed increase in cost. (*Id*.) The quantity of Class II base was decreased from 80,000 to 61,600 square feet for a proposed deduction of $11,040.00. (*Id*.) Lowering the chain link fence around the site from 10 to 8 feet produced a deduction of $11,830.00 and adding an additional 4-5 strands of barbed wire was proposed at a cost of $4,200.00. (*Id*.) The additional sum of $26,165.00 was proposed to cover the cost of performance and payment bonds for HKA and GMC. (*Id*.) Finally several no-cost items were added, including:

| Item Number | Description | Costs |
|---|---|---|
| 9 | Contractor is not obligated to pay assessment fees, connection fees, or plan check fees associated with the project. If fees are incurred by the City of Indio, the Army Corp will cover such fees. | 0.00 |
| 11 | The contract should state that there is an allowance of four security camera [sic] and monitoring system (allowance $25,000) | 0.00 |
| 14 | Contract should state one phone & data line (allowance $5,500) | 0.00 |

(JX 276.002.)

The COE Price Negotiation Memorandum for this June 7, 2005 HKA Proposed Change Order, signed by Roger Berg, indicated agreement with the amounts added and deducted, with the exception of the bond and additional asphalt sums which were, essentially reversed. (JX 282.) The memorandum stated that in the original Fort Worth COE negotiations, while 50,000 square feet were needed for the site, the reduction to 15,000 square feet was made "to provide funding to compensate the contractor for his bonding costs which were not in the original proposal, since this was initially going to be done as a service contract." (JX 282.002.) Accordingly, a note to the memorandum explains:

> Note 1: The negotiated price for the additional asphalt was changed from $00.00 to $26,165.00 which represented the total cost to the contractor for the bonds that were obtained for this project. The contractor has already obtained bonding therefore the cost for putting this work back into the contract is based upon a reasonable cost which approximately $17.20 per CY [cubic yard] which is a fair cost for the additional asphalt. The negotiated cost for the bonding was reduced to $00.00 to account for the fact that the contractor already has their bonds.

(*Id.*)

In connection with HKA's proposal that the contract reflect that the contractor is not responsible for the sewer and water fees required by the City of Indio, on June 15, 2005, Joseph Flynn sent HKA a letter stating that under the Contract Clause 52.236-7 (Permits and Responsibilities) "you are responsible for paying any sewer/water impact fees required to obtain water service for this project." (JX 277.) Anne Hernandez (HKA) responded on June 27, 2005, by submitting a certified claim to the contracting officer, Patricia Bonilla, pursuant to Contract Clause 52.233-1

(Disputes), concerning the payment of sewer/water impact fees.  (JX 430.)  HKA's dispute included the following text:

> 2)    On December 8, 2004, Mr. John Bennett of General Modular submitted a proposal to Mr. Alain Bernier of the U. S. Army Corps of Engineers, 819 Taylor Street, Fort Worth, TX 76102.  This proposal identified General Modular as the prime contractor with Hernandez, Kroone & Associates as the subconsultant.  The total cost of this proposal was $942,273.00.  This proposal clearly showed an **allowance** for obtaining water and sewer service from the City of Indio and the anticipated City's fees of $55,505.00.  The water and sewer fees were shown as an **allowance** because the true dollar amount was unknown.  Between December 8, 2004 and January 10, 2005 two things changed.  General Modular was informed that the Army Corps could not sole source a contract to them and the contracting arrangements changed where Hernandez, Kroone & Associates became the prime contractor with General Modular as the subconsultant.  Hernandez, Kroone & Associates, as an 8(a) firm, could receive a sole source contract.  Secondly, the Army Corps requested that we remove from our scope of work the water and sewer fee allowances since per a conversation with Ken Vian that these fees were not required.  Please see the attached letter to Mr. Alain Bernier dated January 10, 2005.
>
> On January 25, 2005, Hernandez, Kroone & Associates submitted a proposal as a Prime Contractor reflecting the requested revisions on the water and sewer fee allowances.  Hernandez, Kroone & Associates['] proposal totaled $875,768.00.  This reduction is identified in Hernandez, Kroone & Associates['] proposal paragraph 3 which states that the " … Unicor work stations, City of Indio water impact and waster [sic] water impact fees, and bonds are excluded".

In the contract negotiations, the Army Corps had the responsibility to negotiate in good faith.  The General Modular original proposal included allowances for the water and sewer fees.  Whether it's a change in interpretation, need or other reason, when the Army Corps asked for items to be removed from the cost proposal, the Army Corps had the responsibility to remove these items from the contract.  To leave these items in the contract, either through written text or <u>interpretation</u> but fail to recognize their cost impacts is not operating in a good faith.  It is our opinion that the water and sewer fees are the responsibility of the owner, Indio Border Patrol.

(JX0430.006-.007.)

On July 6, 2005, the COE executed bilateral contract Modification No. R00001 which increased the contract price $21,756.71 and added sixty days to the contract completion date. (JX 280.) The modification included the twenty-nine changes to the modular building set forth in the June 7, 2005 HKA-Walden Structures' Proposal. (JX 280.002.) Also included was the fence change from 10-foot to 8-foot with 4 strands of barbed wire, the asphalt change from 15,000 to 50,000 square feet, and the class II base change from 80,000 to 61,600 square feet. (*Id*.)

HKA began submitting the preconstruction plans required by the contract on July 20, 2005, commencing with its Accident Prevention Plan. (JX 127, 444.) This was followed by HKA's submittal of its Quality Control Plan (JX 0003, 449), and its Activity Hazard Analysis (AHA). (JX 0004, 450.)

HKA's Accident Prevention Plan commences with the following Project Description and Phases of Work:

**Project Name:**          **U.S. Border Patrol Station, Indio, CA**

**Project Description:** Install pre-constructed modular building (2,880 sq. ft.), grade lot and construct 80,000 sq. ft. of Class 2 aggregate base with 50,000 sq. ft. of asphalt paving. Miscellaneous features include security lighting, security fencing and video cameras, utility connections, patio with cover, and 400 sq. ft. of landscaping.

**Contractor Accident Experience:** 100% accident free to date.

**Phases of Work:** The work areas requiring AHA plan are as follows:

1. Grading
2. Paving
3. Installation of modular building
4. Erection of light poles
5. Handling of barb wire
6. Utility connections

(JX 127.004.)

The Quality Control Plan submitted by HKA listed the following definable features of work:

-13-

The Contract Quality Control Program outlined in this plan will include a complete listing of definable features of work.  The CQCM's inspection of these work features will be accomplished through implementation of the 3-phase control procedure outline hereinafter.

Definable Features of Work
Clearing & Grubbing
Excavation, backfill and compaction
Foundation
Concrete flatwork
Asphalt paving
Lighting
Fencing
Utilities
Drainage
Delivery and Installation of Modular Building

(JX 0003.006.)

The Activity Hazard Analysis submitted by HKA includes a section on "Lighting," including "Erection of Light Standards."  (JX 0004.006.)

On July 20, 2005, HKA also submitted its Schedule of Values for approval. (JX 128.)  This schedule lists the contract elements included in the contract price, with the dollar amount for each element, and was used to establish a basis for progress payments.  (Tr. 497; JX 128.)

The schedule submitted is as follows:

Contract No. - W9126G-05-C-0010
Contractor - Hernandez, Kroone & Associates, Inc.

| Schedule of Values | TOTAL CONTRACT |
|---|---|
| Design - Surveying/Civil/Electrical | $49,175.50 |
| General Conditions & Mobilization | $10,500.00 |
| Management & Administration | $9,676.00 |
| HKA Bond | $17,515.00 |
| General Modular Bond | $8,650.00 |

| | |
|---|---|
| Modular Units at Factory | $276,250.00 |
| Delivery of Modular | $7,500.00 |
| Installation of Modular | $25,000.00 |
| Preliminary Grading | $21,250.00 |
| Electrical IID (Offsite) | $19,758.21 |
| Sewer & Water Line Installation | $12,500.00 |
| Conduit - Phone/Data | $19,500.00 |
| Final Grading & Paving | $190,000.00 |
| Security Cameras | $25,000.00 |
| Management Construction | $18,500.00 |
| Site Lighting | $27,000.00 |
| Site Electrical (On-Site) | $18,750.00 |
| Landscaping | $7,000.00 |
| Fencing & Gates | $134,000.00 |
| | $897,524.71 |

(JX 128.003.)

On July 25, 2005, Riverside Engineering Group submitted its proposal to HKA to provide "[e]lectrical design for installation of new client provided modular office bldg," which, among other items, included "[p]arking lot lighting plan, pole base detail and point x point lighting calculations." (JX 18.) Also included in the proposal were, "[s]tub-out provisions for security system" and "[s]tub-out provisions for future extension of IID [Imperial Irrigation District] service at street." (*Id.*) The proposal was accepted by HKA and a subcontract with Riverside was executed on or about August 1, 2005. (JX 36.)

HKA's first invoice for a progress payment of $317,033.20 by COE, on the Indio Project, was prepared on August 2, 2005, and covered "Design and manufacturing of modular buildings, site survey, design of civil plans, and preparatory documents required to begin site construction." (JX 458.004 (emphasis in original).) The Schedule of Values listed above was included as a part of the invoice. (JX 458.005.)

-15-

On August 11, 2005, GMC and HKA amended their subcontract, increasing the price by $15,281.71 to reflect the applicable modifications contained in the July 6, 2005 Modification No. R00001 (JX 280), to the COE-HKA contract.  (JX 413.016, 803.179.)

HKA's August Progress Report was submitted to COE (Larry Romero) on August 26, 2005.  (JX 465.)  The report included the information: "Electrical Design will complete 8/30/05.  This includes Imperial Irrigation District's requirements and site lighting parameters, costs and availability."  (*Id*.)

On September 7, 2005, Riverside provided HKA (Roland Hill) with a sketch of the lighting layout questioning whether another light should be added.  (JX 41.)

HKA (Roland Hill) submitted a construction schedule to COE (Larry Romero) on September 9, 2005, which covered installation of lights and security cameras.  (JX 471.)  The schedule provided that from 9-29 to 9-30-2005, site layout would include "Light standards locations."  (JX. 471.003. )  From 10-3 to 10-7-2005, light standards bases would be poured and from 11-2 to 11-4-2005 lights and poles would be erected and security cameras installed.  (*Id*.)

On October 3, 2005, COE and HKA executed bilateral contract Modification No. R00002 increasing the contract amount $18,973.90 to compensate HKA for the water capital improvement fees it had to pay to the City of Indio for water service.  (JX 302, 490.)  This modification resulted from HKA's June 27, 2005 claim (JX 430), submitted to the contracting officer, objecting to any requirement that HKA pay this fee, which prompted COE to obtain funds for the fee from the Border Patrol to cover the expense.  (JX 498.)

HKA submitted its invoice to obtain payment of the $18,973.90 on October 4, 2005.  (JX 307.)  Unlike prior submissions, such as that for its initial progress payment, HKA's $18,973.90 invoice did not include the Schedule of Values it had submitted for COE approval on July 20, 2005.  (JX 128, 307.)   Rather, HKA deleted the elements "Security Cameras," "Site Lighting," "Site Electrical (On Site)" and added the element of "Water Meter (contract modification)."  (*Id*.)  HKA was subsequently informed that the Schedule of Values could not be modified without COE concurrence.  (JX 331.)

On October 8, 2005, HKA (Anne Hernandez) e-mailed COE (Joseph Flynn) concerning the contractual scope of work (SOW).  (JX 309, 511.)  HKA asserts its January 25, 2005 proposal is not included in the contract as follows:

> Dear Joe,
>
> Because the SOW has changed so much during the contract negotiation and the final contract, the SOW items were not always clear and mutually understood as demonstrated at our first meeting.  In an attempt to correct previous deficiencies by HKA, we have thoroughly reviewed the contract in order to bring ourselves into better compliance with your expectations.
>
> It is our understanding that the signed contract is standard form 1442; NSN 7540-01-155-3212.  Therefore the contract states the following:
>
> > • Line Item 10 "Contractor shall furnish all services, etc.…"
> >
> > • Line Item 21 states that "… Line item 001 and the 11 pages of SOW dated <u>11 March 2005</u> is incorporated into the contract …".
> >
> > • Line item 21 does not include HKA's proposal and therefore is not included in the contract.
>
> I have included the 11 page SOW in a PDF image so you can see the documents that I am using for the contract.  Because Line item 21 specifically references the 11 March 2005 SOW, we are taking the position that this SOW replaces the SOW in Line item 001 (solicitation).

(*Id.*)

Among the elements HKA lists as "excluded from the 11 page SOW" are "Lighting," "Security cameras," "[parking lot] Striping," and "Sewer impact fees." (*Id.*)

By a letter dated October 18, 2005, HKA (Anne Hernandez) writes COE concerning her October 8, 2005 e-mail as follows (in part):

> Dear Mr. Flynn:
>
> With this letter I am documenting my October 8, 2005 email to you requesting clarification of the contract scope.  To date, I haven't received a response and this is

impacting my construction schedule.  Therefore, I need to proceed with the contract scope as outlined in my e-mail.

My understanding of the contract scope is as follows:

1.      My proposal is the two page letter sent to the Army Corps dated January 25, 2005.

        The statement of work attached to our proposal reflects a statement of work that John Bennett of General Modular Corporation provided to HKA from the previous solicitation.  On February 4, 2005, the Army Corps sent via e-mail to HKA a revised solicitation for an 8(a) sole source contract.  This solicitation contained a different statement of work.

2.      Between January 25, 2005 and the contract signing date, HKA and the Army Corps negotiated the contract via phone.  The contract documents line item 2 is checked "Negotiated" (RFP).

3.      The statement of work per the contract is the March 11, 2005 statement of work.

In summary, our contract per our interpretation, is our two page proposal, the March 11, 2005 statement of work, and the 8(a) solicitation documents containing all the rest of the contract clauses.

(JX 316.)

Among the elements HKA proposed to delete from plans it previously provided are, "Lighting," "Striping," "Sewer impact fees." (*Id.*)  As for "security cameras," HKA stated:

1.      The security cameras are provided for in our proposal.  What type of cameras, where should they be mounted, what kind of posts are desired, etc?  We need input from the Army Corps so we can order this equipment and design the installation.

(*Id.*)

The scope of work issue was substantially aggravated when, by letter dated October 20, 2005, COE (Joseph Flynn) notified HKA that the modular building constructed by Walden Structures did not conform to the contract specifications in

that, among other items, it lacked a pitched roof and the specified exterior siding. (JX 525.)  For HKA this raised the possibility of having to salvage the existing modular building and begin anew.  (JX 326.001, Tr. 763.)

During this period, the COE's office engineer, Roger Berg, on his own initiative, contacted the IID questioning the IID requirement for a redundant power line on the site to assist in future development, which visit caused complications for HKA in gaining needed IID inspections.  (JX 320; Tr. 692-93, 1447.)  Roger Berg also contacted the Regional Water Control Board providing incorrect information that HKA was operating without a required permit.  (JX 316-17, 320; Tr. 688, 1441.)  HKA's complaints to COE concerning Roger Berg's actions in contacting state agencies were not addressed.  (JX 841; Tr. 725, 1145.)  After Roger Berg's intervention, the IID firmly decided that the requested redundant power line would be installed or there would be no power service provided to the Border Patrol site.  (JX 136.028, 535; Tr. 688-93.)

On October 21, 2005, HKA (Anne Hernandez) addressed a letter to COE (Joseph Flynn) asserting, in part, that "I signed a contract on February 15, 2005.  This contract did not include the statement of work from the January 25, 2005 proposal nor from the March 11, 2005 statement of work."  (JX 322.)  The letter also asserted that with respect to on-site lighting and security cameras from their January 25, 2005 proposal that were included in the Schedule of Values for the first invoice HKA submitted to COE, "We were required to show these items on the schedule of values in order to get paid."  (*Id*.)

Anne Hernandez e-mailed Patricia Bonilla on October 24, 2005, as follows (in part):

> Hi Pat,
>
> I called SBA.  They advised that I stop all work on the project until I get contract clarification.  If I stop all work and then restart, I won't be able to meet the December 1, 2005 completion date.  The area that I am requesting clarification on is the statement of work, drawings and specifications that are included in the contract, if any.  So with this email, I am requesting for you to clarify the contract requirements.
>
> The main issue is the March 11, 2005 specifications for the modular building.  If the March 11, 2005 specifications are part of my contract, then my subcontractor may need to default.  The March 11, 2005 specifications has [sic] specific requirements

> on the modular building which doesn't match the meetings we had with the Ken Vian (end user) and the resulting set of plans that were developed through those meetings. The room sizes on the schematic drawing do not match the room sizes that were developed from design meetings with Ken Vian.  We did not request a contract modification during these design meetings for each and every item against the March 11, specifications because we didn't know that the Army Corp was taking the position that this was part of our contract scope.  Also, the March 11, 2005 specifications have several errors such as requiring asphalt shingles on a low pitch roof.  You need to pick either the low pitch roof or the asphalt shingles but they don't go together.  Another error in these specifications state that restrooms will be "as shown"; however, the schematic drawing doesn't show any restrooms.  If we reconstruct the modular buildings to meet the March 11, 2005 specifications, the real loser is the Border Patrol.

(JX 537.)

On October 27, 2005, Anne Hernandez sent a facsimile transmission to Patricia Bonilla detailing "the impacts of the March 11 specifications." (JX 131.)  The impacts detailed involved the modular building.  (*Id*.)  The transmission further stated (in part):

> My concern and it is a very real concern is that Daniel Moore and Joe Flynn will piece meal to me deficiencies that need to be address[ed] from now to the end of the job so I can't possibly complete meet [sic] a satisfactory completed product and on time date.
>
> We do not have a good relationship and I am strongly concern[ed] about malice on their end.

(*Id*.)

On October 25, 2005, HKA (Richard Hernandez) addressed a six-page letter with attachments to the local California office of the congressman representing the 41st District.  The letter stated (in part):

> With this letter, I am requesting a meeting as soon as possible with the Army Corps of Engineers.  The meeting should include the contracting officer Ms. Patricia Bonilla, a representative from the Small Business Administration, and Mr. Ken Vian of the U.S. Border Patrol.  If "chain of command procedures" are required, additional personnel from the Army Corps should be invited.  I will leave the identification of other personnel to your discretion.

It is very important that this meeting is held as soon as possible and include parties who have authority to issue contract interpretation and direction.  My goal is to get a resolution as to whether or not the March 11, 2005 specifications which were added after I signed the contract are a legally binding part of the contract.…

The modular building design was developed from meetings with Mr. Ken Vian of the U.S. Border Patrol and the Army Corps.  These meetings took place at the Army Corps March Field office during and after the April 26, 2005 kick off meeting with all parties present.  During these meetings, the Army Corps never informed my team that the March 11, 2005 specifications were a part of my contract and that the design direction being provided by Ken Vian was in conflict with those specifications.…

On October 11, 2005, my construction representative attended a meeting with Mr. Ken Vian.  Ken Vian wanted to know how much it would cost for HKA to provide additional work.  My representative collected the list of additional items desired by Ken Vian and I submitted a proposal with a copy to the Army Corps.  The Army Corps, Mr. Joseph Flynn and Mr. Roger Berg, were extremely angry that I submitted an unsolicited proposal and informed me that I was never to do that again.  Furthermore, they called me "a crook" and told me to do only the contract scope and nothing but the contract.…

From October 18 to October 24, I had discussions with others, SBA and performed more investigation on my own.  October 24, 2005, Anne Hernandez issued a revised letter to Joe Flynn, Patricia Bonilla and Daniel Moore stating that my contract is the February 15, 2005 contract that she signed and that the March 11, 2005 specifications that were added after her signature are invalid.  Since issuing this letter, the Army Corps has been adding additional tasks that they say are a part of this contract on almost a daily basis as a penalty.  This new contract interpretation is being issued by Daniel Moore, Joe Flynn and Larry Romero.  The new contract interpretation includes offsite utilities, developer impact fees, correction to a City of Indio's street drainage system that was not working before this construction project, and a restoration plan.  These items are clearly not in my scope and an interpretation is not necessary on these issues.  (The real issue is how can any contractor continue perform [sic] and expect to receive payment for costs incurred with such blatant disregard for contracting law and abuse of power.)…

It appears that the goal is to penalize my contract team as much as possible without regard to the quality of service being delivered to the U.S. Border Patrol.  The modular product as sitting the [sic] on the factory floor contains restrooms, an IT room, and a janitor's closet.  It also contains the intent of what the U.S. Border Patrol wanted delivered.

(JX 330.)

-21-

The COE commenced internal discussions to organize a response to the congressional inquiries which resulted from HKA's request for assistance and to schedule a meeting with HKA to discuss the applicable contractual scope of work. (JX 560, 564, 566, 572, 578-79, 846-48, 850-51; Tr. 1124.) On October 27, 2005, the COE (Joseph Flynn) notified HKA that several deficiencies existed including, "The modular units do not conform to the contract requirements." (JX 136.041.) Flynn informed Richard Hernandez that the contract required a shingled gable roof and T1-11 siding and a number of instances existed where the modular building did not meet specifications. (Tr. 177.) John Bennett (GMC) responded to the assertion of modular deficiencies by a letter, dated November 3, 2005, to Anne Hernandez with a "cc" to COE (Joseph Flynn) pointing out that the modular building was constructed using "7/17 LP Smart Panel in lieu of T1-11 … [which was] dramatically superior in terms of performance, maintenance." (JX 139.003.) Mr. Bennett also explained the installation of a single ply EPDM roof which "exceeds the performance of the [s]hingle roof." (JX 139.004.) Also a shingle roof modular building would be too tall to transport to the site. (*Id*.) On November 8, 2005, the Border Patrol (Ken Vian) informed the COE (Alain Bernier) that the modular building was accepted as built. (JX 576.) Alain Bernier, in turn, transmitted an e-mail to a number of COE personnel, including Daniel Moore, Patricia Bonilla, and Joseph Flynn, stating "Dan, as per the message below, our customer is accepting the modular unit as constructed and should no longer be an issue." (*Id*.) However, the COE did not formally notify HKA that the modular building was acceptable as built until the final inspection for the project, which occurred somewhat later. (Tr. 1170-71, 1175, 1188, 1521.) Joseph Flynn testified as to his belief that HKA was aware of the modular building acceptance situation but could not recall any specific notification to HKA. (Tr. 1725-27.)

A meeting between HKA and COE was scheduled for November 9, 2005 at the COE's March Air Force Base Office. (Tr. 187, 718-722, 1715-16.) Attending were: Anne and Richard Hernandez, together with Roland Hill for HKA; and Daniel Moore, Patricia Bonilla and Joseph Flynn for COE. (JX 142.) The purpose of the meeting was to attempt to resolve the scope of work issues which HKA had raised and then sought congressional and SBA assistance to resolve these issues to their satisfaction. (JX 143, 330, 537.) The meeting lasted some four hours and concluded with what the COE considered an agreement that to the extent there were conflicts in the specifications for the modular building, the three-page Walden specifications would take "precedence." (JX 143.002.) Also, the COE considered that agreement was

reached that the contract scope included the provision of six light poles, six lights and six security cameras by HKA. (*Id.*) The COE further considered that agreement had been reached that the COE would assume the cost of the redundant circuit that the IID was insisting be installed as a condition for providing power to the Indio Border Patrol site. (Tr. 1718.)  A proposed bilateral contract modification setting forth the agreement COE considered was reached was sent to HKA, but it did not include any provision with respect to the IID redundant circuit. (JX 581; Tr. 1730-31.)  Upon review, HKA notified the COE that they did not agree with items 1 and 2 in the proposed modification and would not sign it. (JX 147, 583, 585.)  The Modification No. R00003, dated November 14, 2005, was then issued on a unilateral basis as follows (in relevant part):

### A.  SCOPE OF WORK

**SM004 Clarifications to Scope of Work**
As agreed in the meeting of 9 November 2005 at the March Project Office, the following clarification is made to the scope of work.

1.  The scope of work for the project is the Jan 25th 2005, 21 page proposal from Hernandez Kroone that was sent to Alain Bernier of the Forth Worth District.

2.  If there is a conflict between the (7) seven page modular specification and the (3) three page Walden specification, the Walden specification takes precedence.

3.  It further clarified that the following (4) four points noted in the price negotiation memorandum are part of the scope of work, which are as follows

a.  Permits are not required.
b.  Traffic control during construction when needed will be provided by the Border Patrol.
c.  The contractor will provide testing of the subgrade and the asphalt.
d.  The contractor shall install a new 60' x 2" service conduit between the existing Border Patrol station and the new site.

### B.  CHANGE IN CONTRACT PRICE

Total contract price is unchanged.

### C.  CHANGE IN CONTRACT TIME

The contract completion date shall remain unchanged by this modification.

### D.  CLOSING STATEMENT

> It is understood that pursuant to the above, the contract time is not extended
> and the contract amount is unchanged by this Modification, which reflects
> all credits due the Government and debits due the Contractor, and reflects
> the Government's fair and reasonable estimate.  It is further understood that
> this Modification is being issued on a unilateral basis due to the
> contractor's refusal to sign the modification even though full agreement
> was reached during negotiations.  The contractor has now reneged on that
> agreement and alleges that no agreement was ever reached.

(JX 581.)

By a letter to HKA, dated November 16, 2005, COE (Daniel Moore) clarified
that Modifications R00001 and R00002 "remain in effect and are not changed by the
unilateral clarification modification."  (JX 153.)

On November 21, 2005, Patricia Bonilla, contracting officer, and Daniel
Carrasco, a COE contracting supervisor, participated in a meeting with Anne and
Richard Hernandez together with officials from SBA to discuss the result of the
November 9, 2005 meeting and items requested by HKA.  (JX 160, Tr. 736-740.)

In addition to the six poles, lights and cameras covered by HKA's January 25,
2005 proposal COE requested a cost proposal from HKA to add an additional (No.
7) pole, light and camera which proposal Roger Berg (COE) attempted to negotiate
with HKA.  (JX 163; Tr. 200-06, 224, 740, 746-48, 1473-93.)  The proposal sought
by COE also provided for the deletion of a 1 ½" waterline and the installation of a 1"
waterline for which a credit was sought by COE for the asserted reduced installation
cost.  (JX 163.005.)  HKA objected to the credit as excessive.  (*Id*.)

Consistent with the Modification No. R00003, dated November 14, 2005,
provision that "permits are not required," COE proposed to reimburse HKA for the
sewer impact fee amount it was required to pay to the City of Indio to obtain service,
but in the proposal negotiations, HKA insisted that the cost of labor involved, in
driving to the city to pay the fee also be added to the fee amount.  (JX 163.004.)  In
the proposal negotiations, HKA and COE could not reach agreement on a G&A
(General and Administrative) rate, HKA proposing a rate used for HKA's work for
Caltrans, which the COE did not consider applicable.  (JX 163.005)

In the absence of agreement on the proposal, Roger Berg recommended that a unilateral modification be issued as follows, to include a forty-nine calendar-day extension of the contract performance period:

| SM0003 Add Parking Lot Lights | | | | | | Unilateral Cost | | |
|---|---|---|---|---|---|---|---|---|
| Item | Description | Qty | Unit | Labor | Equip | Material | Unit Cost | Total Cost |
| 1 | Install additional Light with Pole & Conduit | 1 | EA | 2,500.00 | 350.00 | 2,842.00 | 5,692.00 | 5,692.00 |
| 2 | Provide Additional Camera and 1" Conduit | 1 | EA | | 0.00 | | | 4,200.00 |
| 3 | Provide 1" PVC water line to future wash  rack | 200 | LF | 5.00 | 2.00 | 1.40 | 8.40 | 1,680.00 |
| 4 | Provide 1" PVC electrical line to future wash rack | 240 | LF | 5.00 | 2.00 | 1.40 | 8.40 | 2,016.00 |
| 5 | Provide Credit for Water line not installed | -320 | LF | 8.00 | 2.50 | 3.00 | 13.50 | -4,320.00 |
| 6 | Provide 2 4 inch conduits from existing Border Patrol Bldg to new Modular unit | 250 | LF | 14.00 | 3.00 | 15.00 | 32.00 | 8,000.00 |
| 7 | Pay Sewer Impact Fees/Inspection Fees | 1 | | 0.00 | 0.00 | 9,455.00 | 9,455.00 | 9,455.00 |
| 8 | **Subtotal** | | | | | | | **26,723.00** |
| 9 | Office Support | 4 | | 29.00 | 0.00 | | 29.00 | 116.00 |
| 10 | **Subtotal** | | | | | | | **26,839.00** |
| | G&A (11%) | | | | | | | 2,952.29 |
| | **Subtotal** | | | | | | | **29,791.29** |
| | Profit (7.2%) Using weighted guidelines. | | | | | | | 2,144.97 |
| | **Subtotal** | | | | | | | **31,936.26** |
| | Bond (2.0%) | | | | | | | 638.73 |
| | **Total** | | | | | | | **32,574.99** |

(JX 163.006.)

Unilateral Modification No. R00004, dated November 30, 2005, amended the contract price by adding $32,574.99, as proposed by Roger Berg, and extended the contract completion date by forty-nine calendar days.  (JX 161.)

On November 22, 2005, HKA (Richard Hernandez) ordered seven light poles (lamp included) from Walters Wholesale Electric Co., Santa Ana, California and placed the $10,089.23 amount on his personal Bank of America credit card.  (Tr. 374; JX 43.004-.007.)  The $10,089.23 charge included $9,190.00 for the poles, $712.22 for tax and $187.01 for shipping.  (*Id.*)

-25-

On December 13, 2005, HKA submitted a certified claim to Patricia Bonilla, contracting officer, regarding Unilateral Contract Modification No. R00003, dated November 14, 2005. (JX 180.) The claim primarily addressed HKA's contention that the January 25, 2005 proposal cited in Modification No. R00003 was an additional scope of work added to the February 2nd solicitation and the estimated costs cited were for this future additional work. (Tr. 208-230, 299; JX 180.020 (Note 4).)

HKA's claim form listed costs for the contractors that HKA would pay to perform the work, Heisler Engineering, Alcorn, General Modular, as well as HKA's estimated cost for work it would perform. (JX 180.) Claims were not submitted by the other contractors to HKA. (Tr. 301-17, 590.)

With respect to the General Modular portion of the claim, as HKA had not been formally notified that the COE intended to accept the modular building as built, the claim noted that costs listed were estimated for studies and review needed to determine modifications required or whether it would be cheaper to construct a new building. (JX 180.014.) The claim also estimated that HKA needed 119 additional days for contract superintendent service (Roland Hill) at a daily labor rate of $910.00 (14 hours at $65.00 per hour). HKA used a G&A rate of 172% of direct labor for its costs and supported this with a Caltrans audit which it attached as exhibit G to its claim. (JX 180.055.) Also included in the claim was the item "6 Light Poles – $15,000." (JX 180.017.) The December 13, 2005 claim set forth HKA's anticipated cost of $375,743.69 plus costs of $464,779.08 to be paid to subcontractors (consultants), for a total of $840,522.77, asserted to be the anticipated cost of work added by including HKA's January 25, 2005 proposal as a part of the contract. (JX 180.020.) The claim included the following text:

> Since the January 25, 2005 proposal is clearly not part of the contract, the issue with respect to contract adjustment is what additional work is being required by Hernandez Kroone that is not part of the February 4, 2005 solicitation and corresponding proposal and what is the additional cost of that additional work. The Army Corps never requested a cost proposal from Hernandez Kroone to perform the additional work. The proposed contract modification was always offered by the Army Corps without any increase in compensation. If the Army Corps now wants to require Hernandez Kroone to provide all of the work in the January 25, 2005 proposal and make that part of the contract, it can do that, but only with an appropriate adjustment in the contract price. The items being added to the contract and associated dollar value is as shown on the attached spreadsheet.

     It is also important to note that the amounts listed on the spreadsheet are based on anticipated expenses.  Some of the items are based on expected duration of the additional work.   Accordingly, if additional delays and time extensions are encountered during the performance of the work listed above, additional compensation may be requested by Hernandez Kroone as part of this dispute.  The numbers listed above are Hernandez Kroone's best, good faith estimate at the present time, based on Hernandez Kroone's knowledge and belief as of this date.  Changes in material availability or price and/or labor availability or price may require modification to the amounts listed above.

(JX 180.006-.007.)

     HKA (Anne Hernandez) followed the December 13, 2005 claim with an e-mail, dated December 15, 2005, to Patricia Bonilla which included the following text:

Hi Pat,

I sent you a claim via Federal Express and Golden State to make sure that you receive one or the other.  They are both the same claim.

In order to meet the 30 day time limit we sent in a claim that represents our best effort to compile costs within 30 days.  It has come to my attention this morning that there are still a few errors in it.  This is to be expected since we are a small firm and do not have the man power resources to completely compile a claim of this size within 30 days and still meet all of our other business commitments.  We tried to resolve as many errors in both math and contract understanding as we could before submitting the product that you got.

Since this is our first Army Corps project and our first contract which has claims, we do not have experience in this process.  We don't know if it is better to submit a prepared claim to the best of our ability within a 30 day time period even though it may contain errors or to submit a claim at the end of the project when all costs are known.  If we submit a claim at the end of the job, are we still eligible for equitable adjustment when the contract clause under changes clearly states a 30 day time period?  We made a decision to meet the 30 day time limit assuming that as issues get resolved on the outstanding design and construction issues, then the claim could be revised.…

The contract states that we have to submit a claim within 30 days.  Our goal is to submit a claim that represents a fair cost of the extra work required by our team.  Since most of the work hasn't taken place, the costs in the claim are estimates.  We can clean up the estimated costs as best we can for errors and submit an amended

claim or we could submit a claim after our true costs are known.  Again, we don't
have the experience to know how to handle this.

(JX 634.)

By letter dated December 15, 2005, to Patricia Bonilla, HKA (Anne
Hernandez) submitted an equitable adjustment claim for additional conduits,
electrical wire, and IID requirements required by the Imperial Irrigation District in
order to obtain electrical service.  (JX 635.)  As with its December 13, 2005 claim,
the attached cost proposal spreadsheet listed costs for the contractor that would
perform the conduit work, Heisler Engineering, and HKA's contract administrative
cost.  (*Id.*)  The claim spreadsheet listed $11,917.38 (Heisler) and $23,766.83 (HKA)
for a total of $35,684.20 [sic].  (*Id.*)

By a six-page letter, dated December 20, 2005, to Patricia Bonilla, HKA (Anne
Hernandez) submitted a claim for "Contract Scope Clarification" and for an
"Equitable Adjustment" dependent upon the clarifications.  (JX 184.)  As with
previous claims, the equitable adjustment listed work to be performed by contractors
Heisler Engineering, Alcorn, General Modular, and HKA activities.  (*Id.*)  No costs
were listed.  Rather, the cost for any possible work was "TBD" (To Be Determined).
(*Id.*)  COE (Joseph Flynn) responded to HKA's December 20, 2005 claim with a four-
page letter, dated December 29, 2005, which specifically addressed each requested
clarification.  (JX 667.)

By letter dated December 20, 2005, COE (Joseph Flynn) requested HKA
submit a cost proposal for a contract modification to perform additional work
consisting of: 9 additional light fixtures; 5 additional cameras; 2 concrete pads (18'
x 25' and 18' x 45') to allow access to the car wash area; 2 - 8' x 40' CONEX storage
boxes.  (JX 642.)

By letter dated December 23, 2005, HKA (Anne Hernandez) submitted a
$29,348.25 claim to Patricia Bonilla concerning unilateral Modification No. R00004,
dated November 30, 2005.  (JX 189.)  Among the items listed in the claim
spreadsheet was "1 Light Poles - $1,500.00." (JX 189.018.)  HKA also objected to
the $4,320.00 credit in Modification R00004 for the substitution of a 1" PVC water
line for the specified 1-1/2" water line.  (JX 189.003.)  HKA's claim included the
following text:

-28-

On page 2 of the contract modification, item 6, one water line is being deleted and another water line is being installed.  The water line being deleted is being deleted at a cost of **$13.50** per foot while the water line being installed is added to the contract at a price of **$8.40** per foot.  The material cost between the two sizes of pipe is $0.24 per foot.

Per negotiations with Roger Berg, Roger stated that the work to construct a 1 ½ inch water line is significantly higher than that of a 1 inch water line.  We strongly disagree with this statement.  The trenching equipment, the depth of the trench, the labor, etc is all the same.  We are not comparing a 4 foot diameter pipe to a 1 inch water line.  We are comparing sizes of pipe that are only ½ inch difference in size.  The additional water line and the deletion of the water line need to be calculated at the same price for labor, equipment, overhead, etc except for the cost of material which will be different by $0.24 per foot.  This is evidence of the difficulties HKA incurred during these price negotiations and supports HKA's claim that the government did not negotiate in a fair and reasonable manner.

(*Id*.)  HKA's claim also objected to COE's refusal to recognize HKA's G&A rate, stating that "HKA's overhead has remained stable during this entire time and has always been in the range of 165% to 173%." (JX 189.011.)  The claim included the following text:

> During the contract negotiations, Roger Berg refused to recognize HKA's audited overhead rate.  HKA has been audited in accordance to the FAR 31 guidelines by Caltrans since 1992.  These audits have included a full two day audit at HKA's offices, compilation of additional supporting documentation or conferences with our CPA, and a review of HKA's computer accounting program.  Our overhead rate has remained relatively consistent over the last 10 years.  What's the purpose of being audited, sometimes several times a year, if the government is going to selective [sic] ignore the overhead rate when it is convenient for them to do so?

(JX 189.009.)

With respect to COE's December 20, 2005 request for a cost proposal for additional work, HKA, on December 28, 2005, proposed a price of $63,232.72. (JX 679.)  Upon further negotiations, COE and HKA agreed on a price of $43,000.00 with a time extension until March 10, 2006, for contract completion. (*Id*.)  Bilateral Modification No. R00005 was executed on January 23, 2006, increasing the contract price by $43,000.00 and extending the contract completion date by forty-nine calendar days. (JX 198.)  Unlike Modification No. R00004, which expressly required HKA to provide and install conduit and wiring for the additional pole light and

camera involved, Modification No. R00005 does not contain any reference to wiring for the five additional cameras HKA was to provide and install.  (JX 161, 198.) During the negotiations it was HKA's (Richard Hernandez) understanding, based on statements by Roger Berg, that to save funds, Border Patrol personnel would pull wires to the five cameras.  (Tr. 255-56.)  However, HKA was subsequently required to provide the wiring and pull it to the five cameras to obtain final COE acceptance for the project.  (JX 219; Tr. 255-58.)

On January 25 and 27, 2006, Dale E. Kunz, president and owner of Palm Springs Paving, and Anne Hernandez for HKA executed a $135,835.00 subcontract providing for Palm Springs Paving to perform the parking lot paving and striping required in HKA's contract with COE for the Indio Border Patrol site.  (JX 702; Tr. 1930.)  The paving was completed on February 14, 2006, using the 3/4" aggregate in the asphalt mix as specified.  (JX 87, 710; Tr. 245, 1932.)  Palm Springs signed a release to obtain its final payment for the work.  (JX 778.)

On March 16, 2006, Patricia Bonilla, as contracting officer, issued a final decision on HKA's December 13, 2005 claim which was based on the contention that the work included in HKA's January 25, 2005 proposal, referenced in Contract Modification No. R00003, was outside the scope of the contract awarded.  (JX 217.) The contracting officer's decision comprised sixty numbered findings and discussions covering the formation of the COE-HKA contract for the Indio, California Border Patrol Station and relevant contract performance activity. (*Id*.)  HKA's December 13, 2005 claim was denied in that the contracting officer concluded, among other items, that Contract Modification No. R00003 (SM004):

> [w]as not an attempt to include additional work under the contract.  The Corps was not trying to expand the scope of HKA's work by referring to its January 25 proposal, but was trying to document the terms of the agreement that HKA agreed to perform under this contract and avoid further dispute.

(JX 217.015-.016.) The Contracting Officer's Decision denied HKA's December 13, 2005 claim based on a determination as to the agreed contractual scope of work, and did not address any specific cost items asserted by HKA, except to note, "for argument's sake," if any contract price increase were to be awarded, "Installing parking lot lighting and security cameras would not nearly double the dollar value of the entire contract."  (JX 217.017.)

By letter dated April 5, 2006, COE (Paul Apodaca) notified HKA of deficiencies that needed to be corrected prior to the final inspection of the project. (JX 219.)  Several noted deficiencies related to the appearance of the parking lot. (*Id.*)  The use of the specified 3/4" aggregate mix caused the lot surface to have a coarse "popcorn" appearance which was not acceptable to the Border Patrol.  (JX 219; Tr. 249-50, 1931-32.)  The only feasible cure for this "popcorn" appearance was to apply a complete seal coat "slurry" to the entire surface and then restripe the lot. (JX 219; Tr. 250-55, 1933.)  Palm Springs Paving provided HKA with a bid of $7,985.00 covering the application of the seal coat and restriping the parking lot, proceeded to perform this work and billed HKA for $7,985.00. (JX 753; Tr. 1934-35, 2505.)  To date, Palm Springs has not been paid for the seal coat application and lot restriping. (Tr. 1935.)  Palm Springs expects to be paid by HKA and has continued to invoice HKA for the $7,985.00. (Tr. 1937-38, 2509-10.)  HKA admits it owes Palm Springs for this additional work. (Tr. 420-21.)

The final inspection for the Indio Border Patrol Station project was held on April 20, 2006, and the government accepted beneficial occupancy of the project on that date. (JX 225.)  Although this date was forty days past the contract completion date, no liquidated damages were assessed against HKA. (JX 225; Tr. 982-83.)

By letter dated May 3, 2006, HKA (Anne Hernandez) submitted a claim to COE (Daniel Moore, Administrative Contracting Officer) relating to COE's (Paul Apodaca's) letter of April 5, 2006. (JX 227, 766.)  Additional compensation was sought for the sealing and restriping of the parking lot and for the installation of wire to the five cameras added by Modification No. R00005. (*Id.*)  The anticipated claim expense submitted for the seal coat and restriping was $10,267.32. (JX 766.021.)

HKA's December 23, 2005 claim, concerning unilateral Modification No. R00004, was denied on June 6, 2006, by Patricia Bonilla, COE contracting officer. (JX 235.)  The Contracting Officer's Decision stated that she found no merit in HKA's request for additional compensation and the decision included eighteen numbered findings and discussion to support her determination. (*Id.*)

HKA commenced litigation in this court by filing a complaint on March 13, 2007 (ECF No. 1), comprising a *de novo* direct action on its claims pursuant to 41 U.S.C. § 7104(b)(1).  A First Amended Complaint (ECF No. 10) was filed on June 4, 2007.

Following an order, filed October 5, 2009 (ECF No. 64), denying Defendant's Motion to Dismiss For Lack of Jurisdiction (ECF No. 49), defendant filed its Amended Answer to Plaintiff's First Amended Complaint and Defendant's Counterclaims (ECF No. 82).  A two-week trial was held in Pasadena, California where testimony from the following witnesses was presented: Richard Hernandez, HKA co-owner; Anne Hernandez, HKA co-owner; Patricia Bonilla, COE; LaVette Buford, COE; Roger Berg, COE; Joseph Flynn, COE; Larry Romero, COE; Dale Kuntz, Palm Springs Paving; John Bennett, General Modular Corporation; and Craig Sorensen, HKA.  A following one-day trial session was held in Washington, DC where defendant presented the testimony of George Strickler and plaintiff presented rebuttal testimony from Richard Hernandez.

## DISCUSSION

Under the Contract Disputes Act, submission of a claim to the contracting officer is a necessary prerequisite to bringing a direct action suit upon denial of the claim, but the proceeding on the matter in this court is *de novo*, not an appeal of the contracting officer's denial.  41 U.S.C. §§ 7103(e) ("specific findings of fact [in a contracting officer's decision] are not binding in any subsequent proceeding"), 7104(b)(4) (following a contracting officer's decision, "an action [on a claim] shall proceed *de novo*"); *Paragon Energy Corp. v. United States*, 227 Ct. Cl. 176, 645 F.2d 966, 972-75 (1981); *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994).  The contracting officer's final decision is relevant in the *de novo* proceedings insofar as it is a jurisdictional prerequisite for a CDA suit.  *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327-28 (Fed. Cir. 2010).

Plaintiff's claims will be addressed initially.  Plaintiff's main claim, as presented in this court, stems from Modification No. R00003 to the contract clarifying that the scope of the work under the contract includes plaintiff's January 25, 2005 proposal.  Plaintiff asserts that this increased the contractual scope of work, particularly with respect to providing and installing lighting and security cameras on the site, in particular, the six lights and six cameras provided in plaintiff's January 25, 2005 proposal.  Equitable adjustments of differing amounts were proposed during

pretrial proceedings, but the trial testimony seeks $240,148.00 for "adding" lights and cameras via Modification No. R00003. (Tr. 2366-67, 2380.[3/])

Whether plaintiff has a viable additional compensation claim for installation of six lights and six cameras depends upon whether its January 25, 2005 proposal was included in the contract awarded on March 29, 2005.

In resolving whether plaintiff's January 25, 2005 proposal was included in the contractual agreement, reliance is placed on the "truism that how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." *See Pacific Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1290-91 (Fed. Cir. 2008) (citing *Macke Co. v. United States*, 199 Ct. Cl. 552, 556, 467 F.2d 1323, 1325 (1972)).

The facts show that following the award of the contract on March 29, 2005, which referenced plaintiff's January 25th proposal, and was at the price contained in plaintiff's January 25th proposal, plaintiff's contract performance demonstrated the inclusion of its January 25th proposal in the award. For example, the scope of work in HKA's June 4, 2005 subcontract agreement with General Modular Corporation for the modular building employed the Walden Structures' specification included in HKA's January 25th proposal providing for a "black EPDM over ½ gyp sheathing" flat roof, not the "pitched roof" COE original guide included in the subsequent COE solicitation.

The COE price negotiations memorandum for bilateral contract Modification No. R00001 states that the sums were adjusted to provide funding to HKA "[t]o compensate the contractor for his bonding costs which were not in the original proposal, since this was initially going to be done as a service contract." (JX

---

[3/] Defendant seeks to have the testimony of plaintiff's expert, Craig Sorensen, stricken because of the various changes in the amounts proposed during pretrial and trial without adequate notice to defendant's counsel. (Def.'s Post Trial Brief (DPB) 5-12, ECF No. 188.) Failure to comply with pretrial rules and orders can not be condoned, but it is noted that strict compliance was a problem for both parties. (Tr. 2295, 2311-13.) Disclosure failure by plaintiff has not served to prejudice defendant's case. Additional time and a second trial session to take testimony from defendant's expert, George Strickler, was provided. Craig Sorensen's testimony is not stricken in these circumstances.

282.002.)  If the March 29, 2005 award did not include HKA's January 25, 2005 proposal, the "original proposal" and what it included would have been irrelevant.

On June 27, 2005, HKA filed a claim contesting a COE letter stating that HKA was responsible for City of Indio sewer/water impact fees required to obtain water service for the Border Patrol project.  (JX 430.)  As detailed in the findings, *supra*, HKA relied on COE actions in obtaining removal of costs for sewer/water impact fees from the proposals submitted by General Modular and the January 25, 2005 HKA proposal to support its claim that the cost had been removed from the contract.  This claim resulted in bilateral contract Modification No. R00002 increasing the contract price $18,973.90 to cover the water impact fee HKA had to pay the City of Indio.  (JX 302.)

HKA's submissions, commencing in July 2005, of the several preconstruction plans required by the contract included HKA's listing of the contract work required. Among the work items listed in HKA's plans were: security lighting; video cameras; erection of light poles; lighting; and erection of light standards.  The Schedule of Values HKA submitted in July, 2005, for use to obtain progress payments included: "Security Cameras;" "Site Lighting."[4]

Riverside Engineering Group submitted a proposal to HKA on July 25, 2005, to provide "electrical design for installation of new client provided modular office bldg."  The proposal included "[p]arking lot lighting plan, pole base detail and point x point lighting calculations."  (JX 18.)  HKA accepted the proposal and a subcontract was executed on or about August 1, 2005.  (JX 36.)  In September, Riverside provided a lighting layout sketch to HKA and inquired if another light should be added.  (JX 41.)

---

[4] In testimony, Anne Hernandez, asserted that Joseph Flynn, the contracting officer's representative, orally required these items be included in the Schedule of Values in order for HKA to obtain progress payments.  (Tr. 679-80.)  However, in contrast to the prompt filing of a claim on June 27, 2005, when HKA received instructions from the COE that HKA was responsible for City of Indio water/sewer fees, no similar claim action was taken by HKA at the time of the instructions Anne Hernandez testified she received with respect to the content of the Schedule of Values.  The first invoice HKA submitted on August 2, 2005, which included work on the civil plans, employed the Schedule of Values containing security cameras and site lighting.  (JX 458.005.)

The August progress report HKA submitted to COE noted that the electrical design would be complete at the end of the month, including "site lighting parameters, costs and availability." (JX 465.) The construction schedule HKA submitted to COE on September 9, 2005, covered installation of lights and security cameras and stated that the light standard bases would be poured in October, the lights and poles erected and security cameras installed in November. (JX 471.)

In summary, as detailed in the Findings, *supra*, following the submission of a $942,273.00 proposal by GMC to the Fort Worth COE on December 8, 2004, for the Indio Border Patrol Project, which included HKA as a $39,044.50 subcontractor, negotiations with COE reduced the proposal to $875,768.00. The COE determined not to proceed with GMC, but to award an 8(a) sole source contract, which resulted in a switch with HKA, an 8(a) contractor, acquiring all of GMC's bid material and then submitting a January 25, 2005 $875,768.00 proposal to COE. GMC became an HKA subcontractor. To proceed with awarding a sole source 8(a) contract, Fort Worth COE developed a solicitation and HKA responded with a $875,468.00 offer. Fort Worth COE then issued an award, referencing HKA's January 25, 2005 proposal and a contract price of $875,768.00. Payment and performance bonds were provided at the $875,768.00 price. The administration of the contract was then transferred from Fort Worth COE to Los Angeles COE.

Except for the action of the parties under the arrangement, the various proposals and negotiations leading to the award followed by the transfer of contract administration could lead to confusion as to scope of the work involved and to the specifications on which agreement was reached. However, here there is clear evidence of the intent of the parties in their actions and conduct before a dispute arose, relying on the inclusion of plaintiff's January 25, 2005 proposal in the award, particularly the provision of six lights and six cameras and their installation, plus the Walden Structures modular building specifications also included in plaintiff's subcontract with GMC. As the court noted in *Macke*, 199 Ct. Cl. at 556, 467 F.2d at 1325, "We are, of course, entirely justified in relying on this material to discover the parties' underlying intention." *See also Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1564-67 (Fed. Cir. 1987); *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982); *Truong Xuan Truc v. United States*, 212 Ct. Cl. 51, 61 (1976). The evidence gleaned from the actions and conduct of the parties before a dispute arose is convincing to the extent that were it to be concluded that HKA's January 25, 2005 proposal was not expressly incorporated in the March 29, 2005

award, the contract would be reformed to reflect the parties' actual understanding. *Sw. Welding & Mfg. Co. v. United States*, 373 F.2d 982, 989-91, 179 Ct. Cl. 39 (1967); *Pacific Gas & Elec. Co.*, 536 F.3d at 1290-91.  In effect, Modification No. R00003 serves this function in that it either reflects the inclusion of HKA's January 25, 2005 proposal in the contract awarded, or accomplishes its reformation to reflect the parties' actual understanding in this regard.  In either event, Modification No. R00003 does not add work to the scope of the contract and plaintiff's primary claim, based on this contention, lacks validity.

According to plaintiff's "Closing Brief" (ECF No. 189 at 22-23), beyond the direct action claims relating to Modification No. R00003, derived from its December 13, 2005 claim to the contracting officer, there only remains for resolution two *de novo* direct action claims.  One is derived from HKA's December 23, 2005 claim to the contracting officer contesting a $4,320.00 credit taken in Modification No. R00004 for the substitution of a 1" PVC water line for the specified 1 ½" water line, and the second is a direct action claim derived from HKA's May 3, 2006 claim to the administrative contracting officer covering the sealing and restriping of the Indio Border Patrol project parking lot.[5]

With respect to the $4,320.00 credit taken by COE in Modification No. R00004, involving the deletion of 320 linear feet (LF) of 1 ½" PVC waterline from the contract, the COE's negotiator, Roger Berg, explained that the credit was based "only upon the cost of the installation of the 1 ½" waterline." (JX 163.005.)  Roger Berg asserted that "There is considerably more cost in installing a 1 ½" waterline than a 1" waterline." (*Id.*)  HKA's co-owner, Richard Hernandez, testified that he explained to Roger Berg that there was no difference in installation cost between a 1" PVC pipe waterline and a 1 ½" PVC pipe waterline, there was only a material cost difference of 24 cents per linear foot, but the full $4,320.00 deduction was retained in Unilateral Modification No. R00004 and in the contract price HKA was paid. (Tr. 243-44.)  In his analysis of plaintiff's claim, defendant's expert, George Strickler,

---

[5]   To the extent that any claim for delay costs remains extant requiring resolution, the submissions by the two expert witnesses have been carefully reviewed and based on the analysis by George Strickler, it is concluded that no critical path delay in contract completion was the responsibility of the COE.  Delay occurring was concurrent with the result that no basis for additional monetary compensation in this regard has been proven. (JX 803.013; Tr. 2513-16.)  *See Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348 (Fed. Cir. 2000); *Commerce Int'l Co. v. United States*, 167 Ct. Cl. 529, 543, 338 F.2d 81, 89 (1964).

essentially agrees with Richard Hernandez, stating, "Based on experience, there is little, if any, cost differential for the labor and equipment to install 1" in lieu of 1 ½" PVC pipe." (JX 803.063.)  Roger Berg's negotiation recommendation for R00004 listed the labor cost for installation of 1" PVC pipe at $5.00 per LF, the equipment cost at $2.00 per LF and the material cost at $1.40 per LF.  (JX 163.006.)  For the $4,320.00 credit taken for deletion of 1 ½" PVC pipe, the labor cost was $8.00 per LF, the equipment cost was $2.50 per LF, and the material cost was $3.00 per LF.  (*Id.*)  Reducing the labor and equipment costs for 1 ½" PVC pipe to those listed for 1" PVC pipe and adding 24 cents per LF for the higher 1 ½" PVC pipe material cost results in a deduction of $8.64 per LF, as opposed to the $13.50 per LF deduction utilized by COE in Modification No. R00004.  Using the $8.64 deduction, the appropriate credit for deleting 320 LF from the contract requirements equals $2,764.80.  The predominate evidence supports a conclusion that the R00004 unilateral modification included a credit taken by COE which was excessive in the amount of $1,555.20 and that the contract price should be so increased to reflect this reduction in the credit amount ($4,320.00 credit taken minus $2,764.80 credit that should have been taken).

The remaining *de novo* direct action claim requiring resolution seeks $9,366.00 for extra work in applying seal coat to the parking lot to cure a "popcorn-like" appearance caused by the use of 3/4" aggregate in the asphalt and the restriping required after the seal coat was applied.  (Tr. 2366; PX 10106.001.)

The use of the 3/4" aggregate in the asphalt mix for the parking lot paving was required by the COE and caused the "popcorn" appearance deficiency cited by COE. The requirement to correct this "deficiency" was, in effect, a directive to perform additional work not covered by the contract for which an adjustment is required increasing the contract price.  *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993); Changes 52.243-4 (JX 381.095-.096).  Palm Springs Paving provided HKA with its $7,985.00 bid covering the seal coat application and the lot restriping, performed the work and billed HKA for $7,985.00, which remains unpaid to date.  HKA asserts its direct action claim for this work, adding an HKA mark-up of 15% and a 2% mark-up for HKA bond, bringing the claim involved to $9,366.00. (PX 10106.001; Tr. 2332-33.)  Plaintiff's expert, Craig Sorensen, supports the addition of the 15% as a "fee on the work" that he customarily uses in his work on claims and HKA used during the course of the contract.  (Tr. 2333.)  The 2% bond is the sum HKA and the government used in pricing the work.  (*Id.*)  Defendant's

expert, George Strickler, provided a reasonable objection to any mark-up on behalf of Palm Springs Paving to its $7,985.00 invoice as its price appeared to be all inclusive of profit and bond.  (JX 803.064.)  No objection was expressed to the HKA's mark-ups.  (*Id.*)

Defendant opposes recovery for the seal coat and restriping based on the *Severin* doctrine which, when applicable, requires that for a claim asserted by a prime contractor on behalf of a subcontractor, the prime contractor, such as HKA, must be liable to the subcontractor for the costs in suit.  *E. R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369, 1370-71 (Fed. Cir. 1999).  The *Severin* doctrine is not applicable when the relief sought is an equitable adjustment under the changes clause of the prime contract as is involved here.  *Blount Bros. Constr. Co. v. United States*, 172 Ct. Cl. 1, 348 F.2d 471 (1965).  In any event, if the *Severin* doctrine were applicable, defendant has the burden to prove HKA is not liable to Palm Springs Paving for the $7,985.00.  (*Id.*)  Attempting to meet its burden of proof defendant cites the release Palm Springs Paving gave HKA to obtain the final payment under its original $135,835.00 subcontract for the paving lot work.  However, the $7,985.00 claim at issue is for the separate work of seal coating and restriping thereafter, work not covered by the original subcontract, and for which Palm Springs Paving submitted a separate bid.  Defendant has not proven that any binding release exists with respect to the $7,985.00 which Palm Springs Paving seeks to recover from HKA and which HKA agrees it owes.  Defendant also asserts that the four-year California statute of limitations, Cal. Civ. Pro. Code § 337, now bars Palm Springs Paving from suing HKA for the unpaid $7,985.00 debt, so that HKA is not liable.  Defendant, however, does not address the application of Cal. Civ. Pro. Code § 360, acknowledgment or promise sufficient to take case out of statute of limitations.  Here, HKA has acknowledged it owes Palm Springs Paving the $7,985.00 and has timely asserted an equitable adjustment claim to recover the sum plus its fee and bond cost.  Were the *Severin* doctrine applicable, defendant has not satisfied its burden of proving HKA has no liability to its subcontractor for this work.  Accordingly, plaintiff is entitled to an equitable adjustment increasing the contract price by $9,366.00.

Finally, the validity of the defendant's counterclaims, pleaded pursuant to 28 U.S.C. § 2514, 41 U.S.C. § 7103 and 31 U.S.C. § 3729, must be resolved.  These counterclaims addressing mainly the December 13, 2005 CDA claim HKA submitted to the contracting officer, were set forth in Defendant's Amended Answer.  (ECF No. 82.)  This Amended Answer was filed, by leave of court, following the Order (ECF

No. 64) denying Defendant's Motion to Dismiss this litigation on the assertion that the CDA claims HKA submitted lacked validity as no "sum certain" was sought. *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1310-14 (Fed. Cir. 2011); *H. L. Smith, Inc. v. Dalton*, 49 F.3d 1563 (Fed. Cir. 1995).

The contemporary documents establish that the CDA claims defendant addresses in its counterclaims were triggered by COE's erroneous assertion to HKA in October of 2005, that the modular building as constructed by Walden Structures did not conform to the contract specifications. This assertion could only be accurate if HKA's January 25, 2005 proposal was not included as a part of the contract. This is because the modular building was constructed in accordance with the Walden specifications, which includes, for example, a flat roof, as set forth in HKA's January 25, 2005 proposal and HKA's subcontract with GMC, but was not constructed in conformance with the subsequent COE bid solicitation which omitted the Walden specifications and included only the original COE guide. This original COE guide scope of work provided for a pitched roof on the modular building.

COE's assertion of modular building deficiency, in apparent reliance on the original COE guide scope of work was inconsistent with its position that HKA's January 25, 2005 proposal was a part of the contract and caused considerable concern for HKA as to the applicable scope of work, and whether the modular building, as built, may have to be replaced at HKA's expense. HKA's letter of October 24, 2005 to the contracting officer details this concern, "If the March 11, 2005 specifications [the original COE guide] are part of my contract, then my subcontractor may need to default." (JX 537.) HKA and COE continued to review their positions as to the contract scope and requirements with HKA, after some inconsistent assertions, reaching the conclusion that its January 25, 2005 proposal was not part of the awarded contract, and COE concluding that it was. Following settlement negotiations which terminated after COE proposed a bilateral contract amendment which HKA rejected as not reflecting the parties' agreements, COE issued its tendered proposal as unilateral contract Modification No. R00003. The modification, among other items, established HKA's January 25, 2005, 21-page proposal as the scope of work for the project but provided that the Walden specifications were to govern if there were any conflicts with the original COE guide scope of work.

Consistent with its position, HKA treated Modification No. R00003 as a change requiring additional work beyond the scope of the contract. Contract Clause

52.243-4 "CHANGES," contemplates that the contracting officer will make an equitable adjustment in the contract price if a change causes an increase in HKA's cost of contract performance.  (JX 0381.095-.096.)  Referencing Modification No. R00003, Administrative Contracting Officer Daniel Moore, by letter, dated November 15, 2005, notified HKA as follows:

> You are hereby reminded of the following requirements contained in this clause with regard to the subject modification:
>
>> "(e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) of this clause."
>
> Thus, if you intend to assert any rights for adjustment regarding the subject modification, the required statement and proposal must be received by this office no later than December 14, 2005.

(JX 150.)

HKA incorrectly assumed that the requirement in the Contract Clause 52.243-4 to submit, within 30 days, "[a] written statement describing the general nature and amount of the proposal" meant submitting a contract claim in accordance with the CDA.  COE did not correct HKA's assumption.  Accordingly, on December 13, 2005, HKA (Anne Hernandez), while expressing reservations as to this small 8(a) company's ability, "to compile a claim of this size within 30 days " transmitted to the contracting officer a claim, pursuant to Contract Clause 52.233-1 "Disputes," for an equitable adjustment totaling $840,522.77.  (JX 180, 634.)  The claim included nine pages of text, eleven pages of spreadsheets and some forty pages of exhibits.  This claim is the primary source for defendant's counterclaims and the specific counterclaim assertions will be addressed in the context of the statutory requirements involved.

As noted previously, defendant's counterclaims are asserted pursuant to 31 U.S.C. § 3729 (False Claims Act), 41 U.S.C. § 7103 (CDA), and 28 U.S.C. § 2514 (Special Plea in Fraud).

The False Claims Act (FCA) provides, in relevant part, that, in the situation here, where no actual damages are sought, "any person who … knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval," is liable "for a civil penalty of not less than $[5,500] and not more than $[11,000]." 31 U.S.C. § 3729(a)(1); *cf.* 28 C.F.R. § 85.3(a)(9) (civil penalties adjusted for inflation). The government must establish that the claim presented was false or fraudulent, and that the presenter knew the claim was false or fraudulent. *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed. Cir. 1994). "Knowingly" is defined as "actual knowledge," acting "in deliberate ignorance of the truth or falsity of the information," or acting "in reckless disregard of the truth or falsity of information." 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required. *Id*. The government must prove the elements of the cause of action by a preponderance of the evidence. *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998).

The fraud provision of the CDA provides, in relevant part:

> If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim. Liability under this paragraph shall be determined within 6 years of the commission of the misrepresentation of fact or fraud.

41 U.S.C. § 7103(c)(2).[6/]

The CDA defines the term "misrepresentation of fact" as meaning "a false statement of substantive fact, or conduct that leads to a belief of a substantive fact

---

[6/] By the Act of January 4, 2011, Pub. L. No. 111-350, 124 Stat. 3677, the CDA was amended and enacted into positive law. The CDA provisions were relocated from 41 U.S.C. §§ 601-13 (2006) to 41 U.S.C. §§ 7101-09. Comparing 41 U.S.C. § 7103(c)(2) with its source, 41 U.S.C. § 604 (2006), confirms the absence of any substantive change.

material to proper understanding of the matter in hand, made with intent to deceive or mislead." 41 U.S.C. § 7101(9). The government must establish this falsity and intent by a preponderance of the evidence. *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d 1332, 1335 (Fed. Cir. 2009).

Defendant's counterclaims (ECF No. 82 at 15) also include a request for forfeiture of HKA's claims pursuant to 28 U.S.C. § 2514, which provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

In order to obtain a judgment of forfeiture under 28 U.S.C. § 2514, the defendant must establish by clear and convincing evidence that HKA knew that its submitted claims cited were false and that it intended to defraud the government by submitting the cited claims. *Daewoo*, 557 F.3d at 1341; *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed. Cir. 1994). Proof of negligence or ineptitude does not meet the standard of clear and convincing evidence. *Miller v. United States*, 213 Ct. Cl. 59, 68; 550 F.2d 17, 22 (1977). Clear and convincing evidence imposes a heavier burden on a litigant than proof by preponderant evidence but a lighter burden than requiring proof beyond a reasonable doubt. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002); *see generally Grand Acadian, Inc. v. United States*, 105 Fed. Cl. 447, 456-58 (2012).

As bases for its counterclaims, defendant sets forth a number of asserted "falsities" in the CDA claims HKA submitted to the contracting officer, predominantly in the December 13, 2005 claim for an equitable adjustment based on the assertion that Modification No. R00003 comprised a change in the contract scope of work by adding HKA's January 25, 2005 proposal. The HKA December 13, 2005 claim purports to detail the estimated cost of adding the January 25, 2005 proposal to the scope of work HKA was to perform together with the resulting time extension.

Defendant asserts that HKA's claim that Modification No. R00003 comprised a change in the contract scope of work was a "falsity." (Tr. 1958-60.) As discussed previously, the rejection of HKA's claim for an equitable adjustment based on

Modification No. R00003 relies on the conduct of the parties before this dispute arose. However, the somewhat unorthodox manner in which the contract was negotiated initially with GMC and subsequently with HKA to satisfy an 8(a) award obligation, left ample room for argument as to the scope of work involved. The preponderant record evidence shows that after the review triggered by the COE's erroneous assertion that the modular building, as built, did not conform to the contract specifications, HKA evolved to the view that its January 25, 2005 proposal was not part of the awarded contract. This view was seriously researched by COE and debated at a COE-HKA meeting on November 9, 2005. A purported settlement then failed, and unilateral Modification No. R00003 was issued. Based upon full consideration of the record evidence, including the testimony of all witnesses, it is concluded there exists no viable evidence to support defendant's assertion that HKA did not, after October of 2005, believe that the contract, as awarded, did not include HKA's January 25, 2005 proposal. Rather the evidence supports HKA's sincerity in this regard, if not its validity, and HKA did not knowingly present a false or fraudulent claim on December 13, 2005 or thereafter by asserting that their January 25, 2005 proposal was not part of the scope of work in the awarded contract.

Defendant also asserts that HKA's listing of contractors in its claims submitted to the contracting officer comprised a falsity because contractors, such as GMC, did not submit a claim to HKA. (DPB 42-44, ECF No. 188; Tr. 1950-53.) This contention is based upon a misunderstanding of HKA's claims. HKA sought an equitable adjustment to cover what it considered to be added work imposed by unilateral Modification No. R00003. HKA's claims attempted to estimate the cost for this asserted added work and also identified the contractors that HKA anticipated using for the work involved. For example, when asked why he listed Heisler Engineering, Richard Hernandez responded, "At the time he was the person we anticipated using to install." (Tr. 211.) As is discussed previously with respect to HKA's claim for sealing and restriping the parking lot, the *Severin* doctrine requiring that liability to a subcontractor be shown, is not applicable to an equitable adjustment claim such as HKA presented. *Blount Bros. Constr. Co. v. United States*, 172 Ct. Cl. 1, 6-7 348 F.2d 471, 473-74 (1965). The claims are HKA's not those of the contractors listed. As Richard Hernandez testified with respect to the General Modular listing in HKA's December 13, 2005 claim, "The contract was with us. If GMC didn't perform, we would have to do it." (Tr. 298.) The listing in HKA's claims of contractors anticipated to perform the work and the estimated cost involved, in the absence of claims from the contractors does not comprise a "falsity." Richard

Hernandez testified he developed the estimated costs listed in the claim spreadsheets with the aid of Caltrans data and rental rate books. (Tr. 211.) Use of rate compilation books to estimate cost is an accepted construction industry practice. *See Cornell Wrecking Co. v. United States*, 184 Ct. Cl. 289, 291 (1968) (AGC (Associated General Contractor) rates).

Defendant claims that HKA's use of 172 percent of direct labor as its G&A rate in its claims is a "falsity." (Tr. 1955; DPB 45-46, ECF No. 188.) However, defendant offered no proof that the claimed rate was false. Defendant's expert, George Strickler, testified that G&A rates for an engineering company like HKA are often allocated over direct non-contract labor with the result that the rates, in his experience, tend to be a lot higher than for a construction company. (Tr. 2598-99.) However, Mr. Strickler testified he had not seen the calculation of the 172% and offered no opinion as to its validity. (*Id.*) To support its 172% rate, HKA included an August 25, 2004 Caltrans "Preaward Evaluation" as Exhibit G to its December 13, 2005 claim. The evaluation was for a contract to provide right-of-way engineering and land surveying services and was conducted in accordance with the "Attestation Standards set forth in the General Accounting Office's *Generally Accepted Government Auditing Standards*." (JX 180.055.) The report states that it is "intended for the information of Department Management and the Federal Highway Administration." (JX 180.060.) The evaluation noted that, "We also assessed the accounting principles used and significant estimates made by the contractor, as well as evaluated compliance with the CFR 49, Part 18; CFR 48, Chapter 1, Part 31." (JX 180.056.) The evaluation also noted that indirect rates were reviewed for the purpose of accepting contract progress billings. (*Id.*) The evaluation's Finding 4 states:

> The proposed combined indirect cost rate is 172.00 percent. However, we noted several adjustments. As a result, we determined a combined indirect cost rate of 165 percent to be appropriate for this contract.
>
> > **Recommendation:** We recommend the Department's Contract Manger [sic] adjust the indirect cost rate to 165 percent.

(JX 180.060.) The Caltrans evaluation does not support defendant's assertion that the claimed 172% G&A rate is false. It merely states that adjustments for the 2004 contract there involved results in a recommendation that, while 172% was proposed, 165% was appropriate for that contract. HKA's December 23, 2005 claim asserts that its G&A rate was stable and has "always been in the range of 165% to 173%." (JX

189.011.)  No probative record evidence has been cited to prove the contrary.  (*See, e.g.*, Tr. 2622-23.)  In this circumstance, defendant has not carried its burden of proof and the 172% rate has not been proven to comprise a "falsity."

Defendant asserts that the spreadsheet item in HKA's December 13, 2005 claim, "6 Light Poles – $15,000" as an estimate comprises another "falsity."  (JX 180.017; Tr. 373, 1949-50; DPB 42, ECF No. 188.)  Defendant's "falsity" label is based on the action Richard Hernandez took on November 22, 2005, to charge seven light poles from "WALTERS WHLSL ELECTRIC" for $10,089.23 to his personal credit card.  Defendant asserts it comprises a falsity to use a $15,000.00 estimate for six poles when it is asserted that by December 13, 2005, HKA had an actual paid expense of "$10,890" [sic] for seven poles which should have been used.  (Tr. 374; DPB 42, ECF No. 188.)   The problem with defendant's scenario is that Mr. Hernandez's personal credit card statement containing, among other items, a $10,089.23 charge (and a $35.00 overlimit fee), was not received by HKA until December 16, 2005, with a minimum payment due date of December 31, 2005.  (JX 43.007.)  Based on HKA's accounting system, the matter would likely not be recorded until the credit card statement was paid.  (Tr. 372.)  Preparing a substantial claim for submission to the contracting officer within the assumed 30-day deadline ending December 14, 2005, it is reasonable that Mr. Hernandez would utilize an estimate.  If the November 22, 2005 order was placed by telephone, HKA would have no record until the credit card statement was received.  (Tr. 372-75.)  As noted, HKA received Mr. Hernandez's credit card statement containing the $10,089.23 charge for seven poles on December 16, 2005.  HKA's December 23, 2005 claim concerning Modification No. R00004, which added another pole, included the spreadsheet item "1 Light Poles – $1,500."  (JX 189.018.)  This $1,500.00 sum is roughly consistent with the amount on the credit card charge statement received by HKA on December 16, 2005 ($10,089 ÷ 7 = $1,441) and serves to indicate that the prior pole estimate ($15,000 ÷ 6 = $2,500) was replaced by actual cost after the credit card statement was received by HKA.  Moreover, as noted by defendant's expert, George Strickler, for the single pole HKA furnished for Modification No. R00004, COE inserted a material cost of $2,842.00.  (JX 803.052.)  This was the sum estimated by Roger Berg (COE), not by HKA, for inclusion in the unilateral Modification.  (JX 163.006.)  No proof of a knowing "falsity" has been established in the record evidence on this $15,000.00 estimate matter.

Defendant asserts that mark-ups HKA included in its claim estimates for work to be performed by other contractors comprised a "falsity." The two mark-ups involved were 17 percent and 15 percent, both applied to the estimated contractor labor cost. (DPB 44, ECF No. 188; Tr. 357-67.) The mark-ups are transparently stated in HKA's CDA claims. (*See, e.g.*, JX 180.12, 180.15.) Mr. Hernandez testified that the numbers were part of his "estimated level of effort that I was supposed to require to get the work [January 25, 2005 proposal] done." (Tr. 366.) Defendant offered no evidence to support its allegation that the estimate when submitted was false and has not satisfied its burden of proof in this regard.

Finally, defendant asserts that several spreadsheet items in HKA's December 13, 2005 claim, related to the estimated cost that HKA would have to expend for the work site supervision involved in adding its January 25, 2005 proposal to the contract, comprised falsities. (DPB 36-41, ECF No. 188; Tr. 1947-49, 1955, 1958.) These items involve the estimates that 119 calendar days would be required to perform the asserted additional work, the daily rate, mileage, and expenses to be paid the work site superintendent and the G&A cost involved. Defendant's counsel cross-examined Richard Hernandez as to these estimates, but offered no other evidence that the sums claimed comprised a "falsity." (Tr. 317-357.) For example, cross-examination as to the time HKA's Superintendent Roland Hill worked prior to Modification No. R00003, which HKA asserted added the work in its January 25, 2005 proposal to the contract, has no relation to the validity of HKA's estimate in its December 13, 2005 claim for 119 calendar days to perform, in the future, the asserted newly-added work or the amount of superintendent time needed for this asserted added work. No expert testified as to the invalidity of the estimates made. The cross-examination of Richard Hernandez in no way provides the evidence needed to satisfy defendant's burden of proof as to a falsity with respect to the estimates involved. The validity of HKA's estimate cannot be judged by the work HKA performed after December 13, 2005. The December 13, 2005 estimate included matters, that future events, such as COE's eventual acceptance of the modular building, as built, rendered unnecessary to perform.

In addition to the "falsities" defendant asserts with respect to the CDA claim estimates plaintiff submitted to the contracting officer, defendant's counterclaim (ECF No. 82, ¶¶ 53, 56, 60-65) also references HKA's pretrial submissions of its book and record accounting data in support of its *de novo* direct action claim to recover the cost of supplying and installing the lights and cameras claimed to be

added to the contract by Modification No. R00003. Defendant's expert, George Strickler, examined this pretrial data HKA submitted, including labor hour time sheets, daily reports, meeting minutes/notes, etc. (JX 803.007.) From his examination he developed charts questioning the allocation of certain labor hours worked by Roland Hill, Richard Hernandez and Anne Hernandez to disputed trial issues, such as the lights and cameras claim. (JX 803.022-.041; Tr. 2522-34.) In its post trial briefing defendant addresses these allocation matters as damage issues and does not include them in its fraud analysis. (DPB 22-25, ECF No. 188.) If liability had been found for plaintiff's lights and camera equitable adjustment claims, George Strickler's careful analysis of the record evidence in this regard would be given due credit in determining damages. However, as discussed previously, HKA's major equitable adjustment claim has been rejected. If defendant is, contrary to the indications in its briefing, asserting these allocation issues as another "falsity," there is a dearth of evidence pointing to a knowing false submission by HKA. Instead, as noted, the material Strickler used to question certain allocations of booked labor hours to claim items was also disclosed by HKA during pretrial proceedings. (JX 803.022.) HKA's trial evidence on its equitable adjustment claim suffers from a failure to coordinate adequately its booked labor cost entries with other recorded data such as Contractor Quality Control Reports. (*Id.*) The trial evidence on damages supports HKA ineptitude with respect to its accounting record analysis, not fraud.

In these circumstances, it is concluded that defendant has not met its burden of proof under any of the three "fraud" statutes involved.

In this regard, defendant seeks recovery based on the CDA anti-fraud provision, 41 U.S.C. § 7103(c)(2). Instead of its previous free-standing status as 41 U.S.C. § 604, this provision is now codified, more appropriately, as a part of CDA section 7103 headed "Decision by contracting officer." This anti-fraud provision concerns a CDA claim(s) submitted to a contracting officer for a decision. The provision states that

> [i]f a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim.

Defendant predominantly targets HKA's December 13, 2005 CDA claim for an equitable adjustment to establish a basis for recovery under section 7103(c)(2). (DPB 35-46, ECF No. 188.)

The contracting officer denied plaintiff's December 13, 2005 claim in its entirety. (JX 217.)  The contracting officer's decision did not address any of the spreadsheet estimates submitted by HKA with its December 13, 2005 claim, but rested on a determination as to the contractual scope of work.  In regard to applying section 7103(c)(2), the contracting officer's decision on HKA's December 13, 2005 claim does result in a situation where "the contractor is unable to support any part of the claim," in this instance, the entire claim.  The applicable regulation, concerning contracting officer action, 48 C.F.R. § 33.209 provides:

> If the contractor is unable to support any part of the claim and there is evidence that the inability is attributable to misrepresentation of fact or to fraud on the part of the contractor, the contracting officer shall refer the matter to the agency official responsible for investigating fraud.

While there is no evidence in this matter that the contracting officer referred HKA's claim for investigation, the reference to the official responsible for investigating fraud is required because the contracting officer has no authority to address fraud issues. *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540 (Fed. Cir. 1988); *Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 554-56 (1999).

Accordingly, since there cannot be a contracting officer's determination under the CDA that the contractor's inability to support any portion of its CDA claim is attributable to a misrepresentation of fact or fraud, this determination must be made by a tribunal having jurisdiction with respect to a government claim of contractor misrepresentation of fact or fraud.  This would be a United States District Court (28 U.S.C. § 1345) or, as in the instant case, the United States Court of Federal Claims by means of a counterclaim filed in this *de novo* direct action litigation.  28 U.S.C. §§ 1503, 2508;  *Martin J. Simko*, 852 F.2d at 542.  As noted previously, for the government to prevail in attributing a contractor's inability to support any particular portion of its CDA claim to a misrepresentation of fact or fraud, the claim portion involved and the attributable misrepresentation of fact or fraud must be proven by preponderant evidence.  *Daewoo*, 557 F.3d at 1335.  In *Daewoo*, the contractor's project manager testified that "plaintiff filed at least $50 million of its certified claim as a negotiating ploy."  *Daewoo Eng'g & Constr. Co. v. United States*, 73 Fed. Cl.

547, 570 (2006).  The trial judge further found that "The Project Manager testified at one point that Daewoo filed at least $50 million of the claim to indicate 'the seriousness of the situation,' and to get the Government to 'pay attention' so it would agree to a cheaper method of constructing embankments."  *Id*. at 585.  Finally, in reliance on this testimony, the court determined that the portion of the claim that *Daewoo* was unable to support because of misrepresentation of fact or fraud was $50,629,855.88 and so granted the government's claim pursuant to 41 U.S.C. § 7103(c)(2) accordingly.  *Id*. at 596-97.  The Federal Circuit affirmed.  557 F.3d at 1338-40.

There is no evidence in the instant case similar to that in *Daewoo*.[7]  Defendant did not present evidence, as to the portion of HKA's CDA claim estimates that HKA would be unable to support, attributed to some specific misrepresentation of fact or fraud.  In the absence of such evidence, defendant has not met its burden of proof.[8]

---

[7] This is despite several suggestions that HKA's December 13, 2005 estimate could be excessive.  For example, while not addressing any spreadsheet component, the Contracting Officer's March 16, 2006 Decision noted "for argument's sake," "Installing parking lot lighting and security cameras would not nearly double the dollar value of the entire contract."  (JX 217.017.)  However, HKA's December 13, 2005 claim estimate covered considerably more than installing parking lot lighting and security cameras, including sums addressing the possible modification or replacement of the modular building. (JX 180.014.)  Also, HKA's October 25, 2005 letter seeking congressional assistance contains the sentence, "The additional work which the Army Corps is trying to hold me hostage is approximately $200,000 in construction value." (JX 330.005.)  However, in context, this sentence could refer only to the value of the portion of the additional work that HKA would directly perform, whereas the December 13, 2005 estimate included substantial sums for work by other contractors.

[8] The anti-fraud provision of the CDA, 41 U.S.C. § 7103(c)(2), also provides that "Liability under this paragraph shall be determined within 6 years of the commission of the misrepresentation of fact or fraud."  HKA's CDA claims at issue were submitted to the contracting officer in December of 2005. (JX 180, 184, 189, 635.)  The six-year period for determining liability expired in December 2011, prior to the completion of post trial briefing by the parties.  (DPRB (Defendant's Post Trial Reply Brief) and PPRB (Plaintiff's Post Trial Reply Brief), ECF Nos. 191, 192.)  Recovery under 41 U.S.C. § 7103(c)(2) comprises a civil penalty. *Daewoo*, 557 F.3d at 1340.  Under *Gabelli v. SEC*, 133 S. Ct. 1216, 1220-24, ___ L. Ed. 2d ___, ___ (2013), where the government is not suing to recover a loss, but is enforcing a civil penalty, for statute of limitations purposes a fraud cause of action begins to run when the fraud occurs, not when the government discovers it.  Accordingly, it would appear that recovery under 41 U.S.C. § 7103(c)(2) would be time barred in any event.  In the light of *Gabelli*, cases to the contrary which have relied on variations of the so-called "discovery (continued...)"

The circumstances involved with defendant's counterclaims pursuant to 31 U.S.C. § 3729 and 28 U.S.C. § 2514 are similar to those with respect to 41 U.S.C. § 7103. In briefing, defendant equates HKA's presentation as "[n]early a carbon copy of the situation in which the court in *O'Brien* [*O'Brien Gear & Machine Co. v. United States*, 219 Ct. Cl. 187, 591 F.2d 666 (1979)] held warranted forfeiture." (DPB 34, ECF No. 188.)   However, *O'Brien* involved prior criminal fraud convictions, forged test certificates, false checks, bribes, etc., all of which were employed to deceive the government as to O'Brien's true profit in a Renegotiation Act matter. *See O'Brien*, 219 Ct. Cl. at 193, 198, 591 F.2d at 669, 672; *McCarthy v. United States*, 229 Ct. Cl. 361, 373-78, 670 F.2d 996, 1003-07 (1982) *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc). There is no similar evidence in the instant case.   No forged documents, bribes, false checks or similar false records were produced.   Defendant presented no viable evidence that HKA's CDA claim estimates were false and the "falsities" defendant did assert have been shown not to be supported by the required preponderant evidence to establish fraud, and clearly not by the enhanced burden of clear and convincing evidence needed to support forfeiture.

A careful review of the testimony and documents presented in this case results in the conclusion that defendant has not proven that HKA knowingly presented false or fraudulent claims to the government.

In this circumstance, it is **ORDERED**:

1) Judgment shall be entered in favor of HKA in the sum of $10,921.20, plus interest at the rate provided in 41 U.S.C. § 7104, on $1,555.20 of the judgment from December 23, 2005 until payment, and on $9,366.00 of the judgment from May 3, 2006 until payment;

---

[8] (...continued)
rule" to extend the six-year bar of section 7103(c)(2) beyond six years, such as by commencing its running upon discovery of the fraud, may no longer be valid. *See UMC Elec. Co. v. United* States, 45 Fed. Cl. 507, 508-09 (1999); *Jana, Inc. v. United States*, 34 Fed. Cl. 447, 452 (1995); *SGW, Inc. v. United States*, 20 Cl. Ct. 174, 180-81 (1990).

2) Except as granted in (1) all other claims pleaded in plaintiff's First Amended Complaint (ECF No. 10) are **DENIED**;[9] and

3) Judgment shall be entered in favor of HKA on defendant's counterclaims.

s/ James F. Merow
James F. Merow
Senior Judge

---

[9] Plaintiff's claim for prompt payment interest, pleaded in ¶¶ 14(b), 27, and 28 of the First Amended Complaint (ECF No. 10) was dismissed by the Order, filed October 5, 2009.  (ECF No. 64).